E-FILED
Thursday, 03 April, 2025  03:58:22 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

BYLAWS AND RULES OF THE MEDICAL STAFF

OF

VETERANS' HEALTH ADMINISTRATION (VHA)

VA ILLIANA HEALTH CARE SYSTEM

DANVILLE, ILLINOIS

REVIEWED DATE: MARCH 2023

REVISED DATE: MARCH 2023

Table of Contents

PREAMBLE *                                                                                                      1

DEFINITIONS                                                                                                     1

ARTICLE I.    NAME                                                                                              4

ARTICLE II.   PURPOSE                                                                                           4

ARTICLE III.  MEDICAL STAFF MEMBERSHIP *                                                                         5

    Section 3.01    Eligibility for Membership on the Medical Staff *                                            5

    Section 3.02    Qualifications for Medical Staff Membership and Clinical Privileges *                        5

    Section 3.03    Code of Conduct                                                                              7

    Section 3.04 Conflict Resolution & Management

ARTICLE IV: ORGANIZATION OF THE MEDICAL STAFF *                                                                  9

    Section 4.01 Leaders *                                                                                       9

    Section 4.02 Leadership                                                                                     10

    Section 4.03 Clinical Services *                                                                            10

ARTICLE V. MEDICAL STAFF COMMITTEES                                                                             12

    Section 5.01 General                                                                                        12

    Section 5.02 Executive Committee of the Medical Staff *                                                     12

    Section 5.03 Committees of the Medical Staff                                                                16

    Section 5.04 Committee Records and Minutes                                                                  17

    Section 5.05 Establishment of Committees                                                                    17

ARTICLE VI. MEDICAL STAFF MEETINGS                                                                              16

ARTICLE VII.  APPOINTMENT AND ONGOING CREDENTIALING*                                                            17

    Section 7.01 General Provisions                                                                             17

    Section 7.02 Application Procedures *                                                                       20

    Section 7.03 Process and Terms of Appointment *                                                             22

    Section 7.04 Credentials Evaluation and Maintenance *                                                       23

    Section 7.05 Local/VISN-Level Compensation Panels                                                           24

ARTICLE VIII CLINICAL PRIVILEGES *                                                                              24

    Section 8.01 General Provisions                                                                             24

    Section 8.02 Process and Requirements for Requesting Clinical Privileges *                                  25

    Section 8.03 Process and Requirement for Requesting Renewal of Clinical Privileges *                        26

    Section 8.04 Processing an Increase or Modification of Privileges *                                         27

    Section 8.05 Recommendations and Approval for /Renewal, /Revision of Clinical Privileges *                  28

    Section 8.06 Exceptions*                                                                                    29

    Section 8.07 Medical Assessment

i

ARTICLE IX INVESTIGATION AND ACTION *                                          30

ARTICLE X FAIR HEARING AND APPELLATE REVIEW *                                  37

ARTICLE XI RULES AND REGULATIONS *                                             41

ARTICLE XII AMENDMENTS *                                                       41

ARTICLE XIII ADOPTION *                                                        41

MEDICAL STAFF RULES                                                            43

1.    GENERAL                                                                  43

2.    PATIENT RIGHTS *                                                         43

3.    RESPONSIBILITY FOR CARE*                                                 43

4.    PHYSICIANS' ORDERS *                                                     47

5.    ROLE OF ATTENDING STAFF *                                                48

6.    MEDICAL RECORDS *                                                        49

7.    INFECTION CONTROL *                                                      52

8.    CONTINUING EDUCATION *                                                   52

9.    HEALTH STATUS AND IMPAIRED PROFESSIONAL PROGRAM *                        52

10.   PEER REVIEW *                                                            53

## PREAMBLE *

Recognizing that the Medical Staff is responsible for the quality of care delivered by its members and accountable to the Governing Body for all aspects of that care, the Medical Staff practicing at the VA Illiana Health Care System, parent facility located in Danville, Illinois (hereinafter sometimes referred to as VAIHCS) hereby organizes itself for self-governance in conformity with the laws, regulations and policies governing the Department of Veterans Affairs (DVA), Veterans Health Administration (VHA), and the bylaws and rules hereinafter stated. These Bylaws and Rules are consistent with all laws and regulations governing the VHA, and they do not create any rights or liabilities not otherwise provided for in laws or VHA Regulations.

VAIHCS provides primary and secondary healthcare services to Veterans residing in central Illinois and west central Indiana. Inpatient services are available in acute Internal Medicine and Psychiatry. Community Living Centers provide a skilled care environment with special focus on rehabilitation, dementia and Alzheimer's care, mental health recovery and extended care. A full cadre of ambulatory care services is offered including primary care, ambulatory surgery, mental health, substance abuse and specialty care. The parent facility is located in Danville, Illinois with Community Based Outpatient Clinics located in Peoria, Decatur, Springfield, Bloomington and Mattoon, IL.

Portions of these bylaws are required by the VA, VHA, or The Joint Commission (TJC). These sections should be maintained in accordance with all current regulations, standards or other applicable requirements. Prior versions of bylaws and rules and regulations must be maintained in accordance with Sarbanes-Oxley Act which states that bylaws and rules are permanent records and should never be destroyed. They must be maintained in accordance with Record Control System (RCS) 10-1, 10Q.

## DEFINITIONS

For the purpose of these Bylaws, the following definitions shall be used:

1. Advanced Practice Professionals: Advanced Practice Professionals are those health care professionals who are not physicians and dentists and who most often will function within a Scope of Practice but may practice independently on defined clinical privileges as defined in these Bylaws. Advanced Practice Professionals include physician assistants (PA), advanced practice nurses (ARNP, CRNA, and CRNP) Clinical Social Work, and Clinical Pharmacist Practitioners. Advanced Practice Professionals may have prescriptive authority as allowed by Federal Regulation, and/or state of licensure statute and regulations, under the supervision of a credentialed and privileged Licensed Independent Practitioner when required. Unless privileged to do so, Advanced Practice Professionals do not have admitting authority, and may initiate prescriptions for non-formulary drugs or prescribe controlled substances in accordance with state of licensure statutes and regulations. Advanced Registered Nurse Practitioners and other health care professionals may be granted defined clinical privileges when allowed by law and the facility.

2. Appointment: As used in this document, the term Appointment refers to appointment to the Medical Staff. It does not refer to appointment as a VA employee but is based on having an appropriate personnel appointment action, scarce medical specialty contract, or other authority to provide independent medical mid-level and/or patient care services at the facility. Both VA employees and contractors providing patient care services must receive appointments to the Medical Staff.

3. Associate Director: The Associate Director fulfills the responsibilities of the Director as defined in these bylaws when serving in the capacity of Acting Facility Director.

4. Associated Health Professional: As used in this document, the term "Associated Health Professional" is defined as those clinical professionals other than doctors of allopathic, dental, and osteopathic medicine. These professionals include but are not limited to: Pharmacists (Pharm Ds), social workers, psychologists, podiatrists, and optometrists. Associated Health Professionals function under either defined clinical privileges or a defined scope of practice.

1

5. Automatic Suspension of Privileges: Suspensions that are automatically (administratively) enacted whenever the defined indication occurs which warrants a suspension of privileges, and does not require discussion, investigation of clinical care concerns, or result from concern of substandard care, professional misconduct, or professional incompetence. Examples are exceeding the allowed medical record delinquency rate when such delinquency does not impact patient care, conduct/behavior issues not impacting patient care or failure to maintain qualifications for appointment, extended sick leave, or other extended leave. Privileges are automatically suspended until the cause of the suspension has been addressed such as the records are completed or the delinquency rate falls to an acceptable level or the provider returns to duty. Reactivation must be endorsed by the CEB (Clinical Executive Board) and discussion of reactivation should include consideration of a Focused Professional Practice Evaluation (FPPE) depending upon length of time away from practice and reason for the automatic suspension.

6. Chief of Staff: The Chief of Staff is the President of the medical staff and Chairperson of the Clinical Executive Board and acts as full assistant to the Director in the efficient management of clinical and medical services to eligible patients, the active maintenance of a medical credentialing and privileging and/or scope of practice system for Licensed Independent Practitioners, Advanced Practice Professionals, and Associated Health Practitioners. The Chief of Staff ensures the ongoing medical education of medical staff.

7. Clinical Executive Board. The Executive Committee of the Medical Staff. This Board provides the overall review, guidance, and assessment of the clinical functions of the Medical Center.

8. Community Based Outpatient Clinic (CBOC): A health care site (in a fixed location) that is geographically distinct or separate from the parent medical facility. A CBOC can be a site that is VA-operated and/or contracted. A CBOC must have the necessary professional medical staff, access to diagnostic testing and treatment capability, and the referral arrangements needed to ensure continuity of health care for currently and potentially eligible veteran patients. A CBOC must be operated in a manner that provides veterans with consistent, safe, high-quality health care, in accordance with VA policies and procedures.

9. Contract Practitioners: Contracted or subcontracted Practitioners are subject to compliance of this facility's Bylaws and VA policies as well as being reported to the National Practitioner Data Bank or respective state licensing board for substandard care, professional misconduct, or professional incompetence. Removal of a contract practitioner from a contract results in an automatic revocation of privileges. The Contract Provider will be afforded a limited fair hearing to determine only if the revocation of privileges was based upon substandard care, professional misconduct or professional incompetence and reportable to the National Practitioner Data Bank (if Practitioner is a physician or dentist).

10. Director (or Facility Director): The Director (sometimes called Chief Executive Officer) is appointed by the Governing Body to act as its agent in the overall management of the Facility. The Director is assisted by the Chief of Staff (COS), the Associate Director (AD), the Associate Director for Patient Care Services (AD-PCS), and the Clinical Executive Board.

11. Governing Body: The term Governing Body refers to the Under Secretary for Health, the individual to whom the Secretary for Veteran Affairs has delegated authority for administration of the Veterans Health Administration; and, for purposes of local facility management and planning, it refers to the Facility Director. The Director is responsible for the oversight and delivery of health care by all employees and specifically including the medical staff credentialed and privileged by the relevant administrative offices and facility approved processes.

12. Licensed Independent Practitioner: The term Licensed Independent Practitioner (LIP) refers to any individual permitted by law and by the VAIHCS to provide care and services, without direction or supervision, within the scope of the individual's license and consistent with individually granted privileges. In this organization, this includes physicians and dentists. It may also include individuals who can practice independently, who meet this criterion for independent practice. Note: The Full Practitioner Authority (FPA) which was passed on January 14, 2017 permits VA appointed Advance Practice Registered Nurses to practice as Licensed Independent Practitioners regardless of the state

2

licensure held and can practice/ be privileged as such if approved by both Medical Staff and Governance and documented in Medical Staff Bylaws.

13. Medical Staff: The body of all Licensed Independent Practitioners and other Practitioners credentialed through the medical staff process that are subject to the medical staff bylaws. This body may include others, such as retired Practitioners who no longer practice in the organization but wish to continue their membership in the body. The medical staff includes both members of the organized medical staff and non-members of the organized medical staff who provide health care services.

14. Associate Director for Patient Care Services (ADPCS): The Nurse Executive is a registered nurse who is responsible for the full-time, direct supervision of nursing services and who meets licensing requirements as defined by Title 38. S/he acts as full assistant to the Director in the efficient management and consultation of clinical and patient care services to eligible patients, the active maintenance of a credentialing and scope of practice, and privileging system for relevant advanced practice professional and certain associated health staff and in ensuring the ongoing education of the nursing staff.

15. Organized Medical Staff: The body of Licensed Independent Practitioners who are collectively responsible for adopting and amending medical staff bylaws (i.e., those with voting privileges as determined by the facility as defined in these Bylaws) and for overseeing the quality of care, treatment, and services provided by all individuals with clinical privileges.

16. Outpatient Clinic: An outpatient clinic is a healthcare site whose location is independent of medical facility, however; oversight is assigned to a medical facility

17. Peer Recommendation: Information submitted by an individual(s) in the same professional discipline as the applicant reflecting their perception of the Practitioner's clinical practice, ability to work as part of a team, and ethical behavior or the documented peer evaluation of Practitioner-specific data collected from various sources for the purpose of evaluating current competence. Peer recommendations and reviews in the context of credentialing, privileging, and adverse actions must remain distinct and different from USC Section 5705 protected peer review recommendations and activities.

18. Primary Source Verification: Documentation from the original source of a specific credential that verifies the accuracy of a qualification reported by an individual health care Practitioner. This can be a letter, documented telephone contact, or secure electronic communication with the original source.

19. Proctoring: Proctoring is the activity by which a Practitioner is assigned to observe the practice of another Practitioner performing specified activities and to provide required reports on those observations. If the observing Practitioner is required to do more than just observe, i.e. exercise control or impart knowledge, skill, or attitude to another Practitioner to ensure appropriate, timely, and effective patient care, the action constitutes supervision. Such supervision may be a reduction of privileges.

20. CEB Credentials Committee: The CEB Credentials Committee will act on credentialing and clinical privileging matters of the Medical Staff, making recommendation on such matter to the Clinical Executive Board, (Executive Committee of the Medical Staff) as defined in these Bylaws. This board also may act on matters involving Associated Health and Advanced Practice Professionals such as granting prescriptive authority, scope of practice, and appointment. Some professional standards boards (e.g. Nursing, etc.) are responsible for advancement and other issues related to their respective professions.

21. Rules: Refers to the specific rules set forth that govern the Medical Staff of the facility. The Medical Staff shall adopt such rules as may be necessary to implement more specifically the general principles found within these Bylaws. Rules are a separate document from the bylaws. They can be reviewed and revised by the Clinical Executive Board and without adoption by the medical staff as a whole. Such changes shall become effective when approved by the Director.

22. Teleconsultation: The provision of advice on a diagnosis, prognosis, and/or therapy from a licensed independent provider to another licensed independent provider using electronic communications and information technology to support the care provided when distance separates the participants, and where hand-offs on care is delivered at the site of the patient by a licensed independent health care provider

3

23. Telemedicine:  The provision of care by a licensed independent health care provider that directs, diagnoses, or otherwise provides clinical treatment delivered using electronic communications and information technology when distance separates the provider and the patient.

24. VA Regulations:  The regulations set by Department of Veterans Affairs and made applicable to its entities in compliance with Federal laws. (Example:  Code of Federal Regulation (CFR) 38 7402)

## ARTICLE I.    NAME

The name of this organization shall be the Medical Staff of the Department of Veterans Affairs, VA Illiana Health Care System (VAIHCS).

## ARTICLE II.    PURPOSE

The purposes of the Medical Staff shall be to:

1. Assure that all patients receive safe, efficient, timely, and appropriate care that is subject to continuous quality improvement practices.

2. Assure that all patients being treated for the same health problem or with the same methods/procedures receive the same level or quality of care.  Primary care programs will assure continuity of care and minimize institutional care.

3. Establish and assure adherence to ethical standards of professional practice and conduct.

4. Develop and adhere to facility-specific mechanisms for appointment to the Medical Staff and delineation of clinical privileges.

5. Provide educational activities that relate to: care provided, findings of quality of care review activities, and expressed needs of caregivers and recipients of care. Educational activities should be documented in TMS.

6. Maintain a high level of professional performance of Practitioners authorized to practice in the facility through continuous quality improvement practices and appropriate delineation of clinical privileges.

7. Assist the Governing Body in developing and maintaining rules for Medical Staff governance and oversight.

8. Provide a medical perspective, as appropriate, to issues being considered by the Director and Governing Body.

9. Develop and implement performance and safety improvement activities in collaboration with the staff and assume a leadership role in improving organizational performance and patient safety.

10. Provide channels of communication so that medical and administrative matters may be discussed, and problems resolved.

11. Establish organizational policy for patient care and treatment and implement professional guidelines from the Under Secretary for Health, Veterans Health Administration.

12. Provide education and training, in affiliation with established programs, and assure that educational standards are maintained.  Care will be taken to appropriately document supervision of resident physicians and other health trainees.

13. Initiate and maintain an active continuous quality improvement program addressing all aspects of medical practice.  Daily operations will be the subject of continuous quality improvement, as defined through organizational policies and procedures.

14. Coordinate and supervise the scope of practice of all Advanced Practice Professional and appropriate Associate Health Practitioner staff so that their rights and practice goals are achieved and integrated expeditiously to benefit the care of patients.  Each Advanced Practice Professional and appropriate

associated health Practitioner should have a scope of practice statement or privileges as well as the means employed to coordinate and supervise their function with the medical staff.

## ARTICLE III. **MEDICAL STAFF MEMBERSHIP \***

### Section 3.01 Eligibility for Membership on the Medical Staff \*

2. Membership: Membership on the Medical Staff is a privilege extended only to, and continued for, professionally competent physicians, dentists, podiatrists, optometrists, psychologists, chiropractors, and other Licensed Independent Practitioners who continuously meet the qualifications, standards, and requirements of VHA, this Facility, and these Bylaws Categories of the Medical Staff membership include: Active, Associate, and House Staff.

   a. Active Medical Staff. Shall consist of all full-time and part-time physicians, dentist, optometrists, psychologists, podiatrists, chiropractors, and other Licensed Independent Practitioners who are professionally responsible for quality patient care, education, and/or research activities of VAIHCS and who assume all the functions and responsibilities of membership on the Active Staff. Members of the Active Medical Staff shall be appointed to a specific service, shall be eligible to vote, and to serve on Medical Staff committees (full-time staff only) and shall be required to attend Medical Staff meetings (full-time staff only). Exception: Locum Tenens full-time staff providers may not vote and are not required to attend meetings.

   b. Associate Medical Staff. Shall consist of those duly appointed fee-basis and consultant physicians as well as physicians, dentists, optometrists, psychologists, podiatrists, chiropractors, and other LIPs on contract or without compensation (WOC) appointments, who are responsible for supplementing the practice of members of the active staff in their roles in education, patient care and/or research. Consultants will be those individuals who have recognized professional ability and experience of professional rank. Consultants will be appointed to a specific service and shall be permitted to serve on committees. Neither fee-basis, contract staff, staff appointed without compensation, nor consultant staff shall be required to attend meetings of the Medical Staff.

   c. House Staff (Residents). Shall consist of those individuals who are graduates of medical, psychiatry, psychologist, physician assistant, podiatric, osteopathic, or optometry schools, engaged in a formal program of postgraduate training and education at the VAIHCS, with or without compensation. The Designated Education Officer (DEO) recommends house staff for appointment for a limited period of training subject to the regulations of the Department of Veterans Affairs. House Staff is not included for the purposes of clinical privileges. House Staff will function only under the supervision of, and within the clinical privileges as deemed appropriate by and granted to a qualified practitioner who has clinical privileges in the area being supervised, and will be supervised as per VHA Handbook 1400.01, Resident Supervision. However, their representatives are expected to function in a manner, which is consistent with the Medical Staff Bylaws and Rules and Regulations. House Staff are not voting members of the Medical Staff.

3. Decisions regarding Medical Staff membership are made without discrimination for reasons such as race, color, religion, national origin, gender, gender identity, sexual orientation, lawful partisan political affiliation, marital status, physical or mental handicap when the individual is qualified to do the work, age, membership or non-membership in a labor organization, or on the basis of any other criteria unrelated to professional qualifications.

### Section 3.02 Qualifications for Medical Staff Membership and Clinical Privileges \*

1. Criteria for Clinical Privileges: To qualify for Medical Staff membership and clinical privileges, individuals who meet the eligibility requirements identified in Section 3.01 must submit evidence as listed below. Applicants not meeting these requirements will not be considered. This determination of ineligibility is not considered a denial:

a. Active, current, full and unrestricted license(s) to practice individual's profession in a state, territory or commonwealth of the United States or the District of Columbia as required by VA employment and utilization policies and procedures. For new appointments after a break in service, all licenses active at the time of separation need to be primary source verified for any change in status. All license(s) must be in accordance with U.S. Code provision – 38 U.S.C section 7402.

b. Education applicable to individual Medical Staff members as defined, for example holding a Doctoral level degree in Medicine (MD), Osteopathy (DO), Dentistry (DDS/DMD), Optometry (OD), Psychology (PhD or PsyD), Podiatry (DPM), etc. from an approved college or university.

c. Relevant training and/or experience consistent with the individual's professional assignment and the privileges for which he/she is applying. This may include any internship, residencies, fellowships, board certification, and other specialty training.

d. Current competence, consistent with the individual's assignment and the privileges for which he/she is applying.

e. Health status consistent with physical and mental capability of satisfactorily performing the duties of the Medical Staff assignment within clinical privileges granted.

f. Complete information consistent with requirements for application and clinical privileges as defined in Articles VII or VIII or of these Bylaws for a position for which the facility has a patient care need, and adequate facilities, support services and staff.

g. Satisfactory findings relative to previous professional competence and professional conduct.

h. English language proficiency.

i. Current professional liability insurance as required by Federal and VA acquisition regulations for those individuals providing service under contract.

j. A current picture hospital ID card or a valid picture ID issued by a state or federal agency (e.g. driver's license or passport).

k. A current Personal Identity Verification (PIV) Card.

2. Clinical Privileges and Scope of Practice: While only Licensed Independent Practitioners may function with defined clinical privileges, not all Licensed Independent Practitioners are permitted by this Facility and these Bylaws to practice independently. All Practitioners listed below are subject to the bylaws whether they are granted defined clinical privileges or not.

   a. The following Practitioners will be credentialed and privileged to practice independently

      i) Physicians

      ii) Dentists

   b. The following Practitioners will be credentialed and may be privileged to practice independently if in possession of State license/registration that permits independent practice and authorized by VA Illiana Health Care System

      i) Advanced Practice Nurses including contract staff (CNP, CNM, and CNS)

      ii) Certified Registered Nurse Anesthetists (CRNA)

      iii) Clinical Social Workers (LCSW)

      iv) Audiologists

      v) Speech Pathologists

      vi) Clinical Pharmacists

      vii) Optometrists

      viii) Podiatrists

      ix) Chiropractors

      x) Psychologists

  c. The following Practitioners will be credentialed through the Medical Staff process, including re-credentialing, and will practice under a Scope of Practice with appropriate supervision:

      i) Physician Assistants. Reference VAIHCS Medical Center Memorandum #11-59.

      ii) Clinical Pharmacist Practitioners

      iii) Contract APRNS who are not licensed in a state which recognizes their APRNs as Licensed Independent Practitioners.

      iv) Certified Registered Nurse Anesthetists (CRNAs) who do not hold a license in a state that recognizes CRNAs as Licensed Independent Practitioners

  d. The following Practitioners will be credentialed through the Medical Staff process including re-credentialing and may be privileged in accordance with the Full Practice Authority, regardless of state licensure held if they hold a VA staff appointment (e.g., WOC, full-time, part-time, intermittent):

      i) Certified Nurse Practitioners (CNP), Certified Nurse Midwives (CNM), Certified Nurse Specialists (CNS)

3. Change in Status: Members of the Medical Staff as well as all Practitioners practicing through privileges or a scope of practice must agree to provide care to patients within the scope of their Delineated Clinical Privileges or Scope of Practice and advise the Director, through the Chief of Staff, of any change in ability to fully meet the criteria for Medical Staff membership, the ability to carry out clinical privileges which are held, and any changes in the status of professional credentials, such as, but not limited to, loss of licensure, clinical privileges, or certification, as well as any pending or proposed action against a credential, such as, but not limited to, licensure, clinical privileges, certification, professional organization or society as soon as able, but no longer than 15 days after notification of the practitioner.

## Section 3.03 Code of Conduct

1. Acceptable Behavior: The VA expects that members of the medical staff will serve diligently, loyally, and cooperatively. They must avoid misconduct and other activities that conflict with their duties; exercise courtesy and dignity; and otherwise conduct themselves, both on and off duty, in a manner that reflects positively upon themselves and VA. Acceptable behavior includes the following (1) being on duty as scheduled. (2) being impartial in carrying out official duties and avoiding any action that might result in, or look as though, a medical staff member is giving preferential treatment to any person, group or organization, (3) not discriminating on the basis of race, age, color, sex, religion, national origin, politics, marital status, sexual orientation, gender identity, or disability in any employment matter or in providing benefits under any law administered by VA, (4) not making a governmental decision outside of official channels, (5) not taking any action that impedes government efficiency and economy, affects one's impartiality, or otherwise lowers public confidence in the Federal Government, and (6) with certain exceptions in accordance with 5 C.F.R. 2635, not asking for or accepting any gift, tip, entertainment, loan, or favor, or anything of monetary value for oneself or any member of one's family from any person or organization that is seeking or has a business or financial relationship with the VA to avoid the appearance that one's official actions might be influenced by such gifts.

2. Disruptive Behavior and Inappropriate Behavior: VA recognizes that the manner in which its Practitioners interact with others can significantly impact patient care. VA strongly urges its providers to fulfill their obligations to maximize the safety of patient care by behaving in a manner that promotes both professional practice and a work environment that ensures high standards of care. The Accreditation Council for Graduate Medical Education highlights the importance of interpersonal/communication skills and professionalism as two of the six core competencies required

for graduation from residency. Providers should consider it their ethical duty to foster respect among all health care professionals as a means of ensuring good patient care. Conduct that could intimidate others to the extent that could affect or potentially may affect quality and safety will not be tolerated. These behaviors, as determined by the organization, may be verbal or non-verbal, may involve the use of rude and/or disrespectful language, may be threatening, or may involve physical contact.

Behavior or Behaviors That Undermine a Culture of Safety: is a style of interaction with physicians, hospital personnel, patients, family members, or others that interferes with patient care. Behaviors such as foul language; rude, loud or offensive comments; and intimidation of staff, patients and family members are commonly recognized as detrimental to patient care. Furthermore, it has become apparent Behavior, or Behaviors That Undermine a Culture of Safety is often a marker for concerns that can range from a lack of interpersonal skills to deeper problems, such as depression or substance abuse. As a result, Behavior or Behaviors That Undermine a Culture of Safety may reach a threshold such that it constitutes grounds for further inquiry by the CEB (Executive Committee of the Medical Staff) into the potential underlying causes of such behavior. Behavior by a provider that is disruptive could be grounds for disciplinary action.

VA distinguishes Behavior or Behaviors That Undermine a culture of Safety from constructive criticism that is offered in a professional manner with the aim of improving patient care. VA also reminds its providers of their responsibility not only to patients, but also to themselves. Symptoms of stress, such as exhaustion and depression, can negatively affect a provider's health and performance. Providers suffering such symptoms are encouraged to seek the support needed to help them regain their equilibrium. Reference Medical Center Memorandum 11-102, Management of the Impaired Physician, Dentist, Optometrist, Podiatrist and Licensed Independent Practitioner.

Providers, in their role as patient and peer advocates, are obligated to take appropriate action when observing Behavior or Behaviors That Undermine a Culture of Safety on the part of other providers. VA urges its providers to support their hospital, practice, or other healthcare organization in their efforts to identify and manage Behavior or Behaviors That Undermine a Culture of Safety, by taking a role in this process when appropriate.

3. Professional Misconduct: Behavior by a professional that creates the appearance of a violation of ethical standards or has compromised ethical standards will not be tolerated.

## Section 3.04: Conflict Resolution & Management

For VA to be effective and efficient in achieving its goals the organization must have clear objectives and a shared vision of what it is striving to achieve. Therefore, there must be a mechanism for the recognition of conflict and its resolution in order to make progress in meeting these established goals. Conflict management is the process of planning to avoid conflict when possible and manage to resolve such conflict quickly and efficiently when it occurs. VA Handbook 5978.1, Alternative Dispute Resolution Program, addresses the conflict resolution and management process available in VA, as well as resources to engage in mediation as well as non-binding, or binding arbitration. *This mechanism can be utilized to manage conflict between the Executive Committee of the Medical Staff and the Organized Medical Staff on issues including, but not limited to proposals to adopt a rule or regulation or policy or amendment thereto. Nothing in the foregoing is intended to prevent Medical Staff members from communicating with the Governing Body (Director) on a rule, regulation or policy adopted by the Organized Medical Staff or the Executive Committee of the Medical Staff. The Governing Body (Director) must determine the method of this communication.* VHA expects VA medical center leadership to make use of these and other resources in communicating expectations to clinicians and other staff that conflictive, disruptive, inappropriate, intimidating, and uncivil behavior can compromise VHA's mission of high-quality health care service to Veterans. VA staff who experience or witness such behavior are encouraged to advise an appropriate supervisor, Patient Safety Officer, or other individual as described in the following Agency resources: Office of Diversity

8

and Inclusion (EEO) website at http://www.diversity.hr.va.gov/index.asp and these resources: Alternative Dispute Resolution:  Memorandum on Alternative Dispute Resolution for Workplace Disputes, (February 8, 2007), VA Directive 5978, Alternative Dispute Resolution (February 23, 2000), and VA Handbook 5978.1, Alternative Dispute Resolution Program: Central Office (December 11, 2007)

## ARTICLE IV:  ORGANIZATION OF THE MEDICAL STAFF *

### Section 4.01 Leaders *

1. Composition: Chief of Staff. There are no elected officers of the Medical Staff. The Chief of Staff, by virtue of his/her appointment and Department of Veterans Affairs regulations, shall be the president of the Medical Staff

2. Qualifications:  The Chief of Staff will be a Doctor of Medicine and/or osteopathy and must have a valid license to practice in some State within the United States. In addition, the following qualifications are required:

    a. Recognition by peers for clinical competence.

    b. Board Certification or its equivalent, unless waived by the Chief Medical Director

    c. Extensive clinical experience and an understanding of the relationship between various patient care providers.

    d. History of successful administrative accomplishment.

    e. Leadership traits that demonstrate the courage of convictions, patience, and an ability to work with others.

    f. Emotional and physical stamina appropriate to the position.

    g. Competence in basic management skills, such as planning, problem solving, interpersonal relations, leadership, communications, personnel management, resource management, public relations, VA and government wide environments, and health care administration.

3. Selection: The Organized Medical Staff does not elect medical staff officers. The Medical Staff Bylaws are approved by the organized medical staff, which constitutes the agreement of the leadership organization. The Network Director approves recommendations to the position of Chief of Staff. The selecting organization is responsible to complete and submit information on the selectee to the Leadership Management and Succession Sub-Committee (LMSS).  The LMSS support staff Workforce Management and Consulting office will submit templates to the Leadership Management and Succession Subcommittee and Workforce Committee for information only.

4. Removal:  All disciplinary and/or adverse actions involving a Chief of Staff position must be referred to the Office of the Accountability Review (OAR).  The OAR Employee Relations division will assign an Employee Relations Specialist to work directly with the proposing and deciding officials.

5. Duties:

    a. Chief of Staff serves as Chairperson of the Clinical Executive Board (CEB). The Chief of staff shall serve as the Chief Administrative Officer of the Medical Staff according to VA regulations to: Act in coordination and cooperation with the Medical Center Director in all matters of mutual concern within the medical center;

    b. Call, preside at, and be responsible for the agenda of all general meetings of the Medical Staff;

    c. Serve as Chair of the CEB (Executive Committee of the Medical Staff);

    d. Be responsible for the enforcement of Medical Staff Bylaws, rules and regulations, in collaboration with the chiefs of the clinical services;

    e. Appoint committee members to all standing, special and multidisciplinary medical staff committees;

9

f.  Represent the views, policies, needs and grievances of the medical staff to the Medical Center Director;

g.  Receive and interpret the policies of the Medical Center Director to the medical staff and report to the Medical Center Director on the performance and maintenance of quality with respect to the medical staff's delegated responsibility to provide medical care;

h.  Be responsible through the DEO for educational activities of the Medical Staff, and

i.  Be spokesperson for the Medical Staff in its external, professional and public relations.

## Section 4.02 Leadership

1.  The Organized Medical Staff, through its committees and Service Chiefs and comprised of Licensed Independent Providers provides oversight, counsel and assistance to the Chief of Staff and Director regarding all facets of patient care, treatment, and services including evaluating and improving the quality and safety of patient care services.  The Organized Medical Staff enforces and upholds the medical staff bylaws, rules and regulations, and policies that have been recommended and approved by the governing body in certain circumstances.

2.

a.  All Medical Staff members are eligible for membership on the Clinical Executive Board.

b.  All Clinical Service Chiefs are members of the Clinical Executive Board.

## Section 4.03 Clinical Services *

1.  Characteristics:

a.  Clinical Services are organized to provide clinical care and treatment under leadership of a Service Chief who are members of the Medical Staff.

b.  Clinical Services hold service-level meetings at least monthly.

2.  Functions:

a.  Provide for quality and safety of the care, treatment, and services provided by the Service.  This requires ongoing monitoring and evaluation of quality and safety, (including access, efficiency, and effectiveness); appropriateness of care and treatment provided to patients (including that provided under disaster privileges or emergency care absent privileges); patient satisfaction activities; patient safety and risk management activities; and utilization management. Determines the adequacy of resources needed for each requested privilege.

b.  Assist in identification of important aspects of care for the Service, identification of indicators used to measure and assess important aspects of care and improving processes and evaluation of the quality and appropriateness of care.  Utilize VHA performance measures, monitors, and sentinel event data as a basis for assessing the quality, timeliness, efficiency, and safety of Service activities.

c.  Maintain records of meetings that include reports of conclusions, data, recommendations, responsible person, actions taken, and an evaluation of effectiveness of actions taken.  These reports are to be forwarded in a timely manner through the Chief of Staff, at a minimum on a monthly basis.

d.  Develop criteria for recommending clinical privileges for members of the Service and ensure that ongoing professional practice evaluation is continuously performed, and results are utilized at the time of re-privileging.

e.  Define and/or develop clinical privilege statements including levels (or categories) of care that include all requirements of VHA Handbook 1100.19.

f.  Develop policies and procedures to assure effective management, ethics, safety, communication, and quality within the Service.

10

g.  Annually review privilege templates for each Service and make recommendations to Executive Committee of the Medical Staff with approval of the Director.

3.  Selection and Appointment of Service Chiefs: Service Chiefs are appointed by the Director based upon the recommendation of the Chief of Staff. Separate from these Bylaws, and in compliance with VA/VHA Policy, VAIHCS will determine how the search is to be conducted, how each candidate's qualifications are reviewed, and how recommendations are made to the Chief of Staff as to the quality of each applicant. Criteria for appointment as Service Chief include Board Certification/or equivalent experience and comparable training as vetted through the credentialing process.

4.  Duties and Responsibilities of Service Chiefs: The Service Chief is administratively responsible for the operation of the Service and its clinical and research efforts, as appropriate. Ensures that resources are present for each approved privilege. In addition to duties listed below, the Service Chief is responsible for assuring the Service performs according to applicable VHA performance standards. These are the performance requirements applicable to the Service from the national performance contract, and cascade from the overarching requirements delegated to the Chief of the Medical Staff. These requirements are described in individual Performance Plans for each Service Chief. Service Chiefs are responsible and accountable for:

    a.  Completing Medical Staff Leadership and Provider Profiling on-line training within three months of appointment as Service Chief.

    b.  Clinically related activities of the Service.

    c.  Administratively related activities of the department, unless otherwise provided by the organization.

    d.  Continued surveillance of the professional performance of all individuals in the Service who have delineated clinical privileges through FPPE/OPPE.

    e.  Recommending to the medical staff the criteria for clinical privileges that are relevant to the care provided in the Service.

    f.  Recommending clinical privileges for each member of the Service.

    g.  Assessing recommendations for off-site sources of needed patient care, treatment, and services not provided by the Service and communicating the recommendations to the relevant organizational authority.

    h.  The integration of the Service into the primary functions of the organization.

    i.  The coordination and integration of interdepartmental and intradepartmental services.

    j.  The development and implementation of policies, manuals, and procedures that guide and support the provision of care, treatment, and services.

    k.  The assurance of a sufficient number of qualified and competent persons to provide care, treatment, and service.

    l.  The determination of the qualifications and competence of service personnel who are not licensed independent Practitioners and who provide patient care, treatment, and services.

    m.  The continuous assessment and improvement of the quality of care, treatment of patients, and services.

    n.  The maintenance of and contribution to quality control programs, as appropriate.

    o.  The orientation and continuing education of all persons in the service.

    p.  The assurance of space, equipment, staffing and financial resources necessary for the service defined to be provided for the patients within a specified timeframe.

11

## ARTICLE V. MEDICAL STAFF COMMITTEES

### Section 5.01 General

1. Committees are either standing or special.

2. All committee members, regardless of whether they are members of the Medical Staff, are eligible to vote on committee matters unless otherwise set forth in these Bylaws. A vote to abstain is not considered a vote and should not be used unless there is a conflict of interest or perceived conflict of interest.

3. The presence of 50 percent + 1 of a committee's members will constitute a quorum.

4. Membership – Recommendation for committee membership may come from the committee itself to the Chief of Staff. The Chief of Staff will consent to the appointment of committee members to all standing, special and multidisciplinary Medical Staff committees with the exception of the Clinical Executive Board.

5. Unless otherwise set forth in these Bylaws, other than the Clinical Executive Board, the Chairperson of all standing committees shall be appointed by, and may be removed by, the Chief of Staff and/or Medical Center Director.

6. Robert's Rules of Order Newly Revised will govern all committee meetings.

### Section 5.02 Executive Committee of the Medical Staff *

1. Characteristics: The Clinical Executive Board (CEB) serves as the Executive Committee of the Medical Staff.

   a. The Clinical Executive Board has the following membership: Chief of Staff, Chairperson, voting

   b. Chief, Dental Service, voting

   c. Chief, Imaging Service, voting

   d. Chief, Geriatrics & Extended Care Service, voting

   e. Chief, Mental Health Service, voting

   f. Chief, Medical Service, voting

   g. Pathology and Laboratory Medicine Representative, voting

   h. Chief, Surgical Service, voting

   i. ACOS for Ambulatory Care, voting

   j. Practitioners appointed through the medical staff process, term of two years, voting.

   k. Director, or designee, ex-officio, non-voting, as appropriate

   l. Associate Director for Patient Care Service (ADPCS)/ Nurse Executive, Ex-Officio, non-voting

   m. Chief Quality Management, non-voting

   n. Chief, Pharmacy Service, non-voting

   o. Chief, Nurse, Operations/Acute Care & Ambulatory Care, non-voting

   p. Chief, Social Work Service, non-voting

   q. Chief, Nutrition & Food Service, non-voting

   r. Women's Health Program Manager, non-voting

   s. Health System Specialist to Chief of Staff, non-voting

   t. Labor Partners, non-voting

12

u. The majority of the voting members must be fully licensed physicians of medicine or osteopathy.

v. Process for membership: The Chief of each service under the Chief of Staff, key Chief of ancillary services under the ADPCS are members along with one member at large selected by the Chief of Staff and Director.

w. Removal process for membership: Removal will be based on performance and may be accomplished through the recommendations of the Chief of Staff and approved by the Director.

1. Functions of the Clinical Executive Board: The Clinical Executive Board: *

   a. Acts on behalf of the Medical Staff between Medical Staff meetings within the scope of its responsibilities as defined by the Organized Medical Staff.

   b. Maintains process for reviewing credentials and delineation of clinical privileges and/or scopes of practice to ensure authenticity and appropriateness of the process in support of clinical privileges and/or scope of practice requested; to address the scope and quality of services provided within the facility.

   c. Acts to ensure effective communications between the Medical Staff and the Director.

   d. Makes recommendations directly to the Director regarding the:

      i) Organization, membership (to include termination), structure, and function of the Medical Staff.

      ii) Process used to review credentials and delineate privileges for the medical staff.

      iii) Delineation of privileges for each Practitioner credentialed.

   e. Coordinates the organization- wide ongoing review, evaluation, and performance improvement activities and ensures full compliance with Veterans Health Administration Clinical Performance Measures, The Joint Commission, and relevant external standards.

   f. Oversees process for addressing instances in which there is "for-cause" concern (substandard care, professional incompetence or professional misconduct) related to a medical staff member's competency to perform the requested or held privileges.

   g. Oversees process in place for instances of "for-cause" concerning a medical staff member's competency to perform requested privileges.

   h. Oversees process by which membership on the medical staff may be terminated consistent with applicable laws and VA regulations.

   i. Oversees process for fair-hearing procedures consistent with approved VA mechanisms.

   j. Monitors medical staff ethics and self-governance actions.

   k. Advises facility leadership and coordinates activities regarding clinical policies, clinical staff recommendations, and accountability for patient care.

   l. Receives and acts on reports and recommendations from medical staff committees including those with quality of care responsibilities, clinical services, and assigned activity groups and makes needed recommendations to the Governing Body.

   m. Assists in development of methods for care and protection of patients and others at the time of internal and external emergency or disaster, according to VA policies.

   n. Acts upon recommendations from the CEB Credentials Committee.

   o. Acts as and carries out the function of the Physical Standards Board, which includes the evaluation of physical and mental fitness of all medical staff upon referral by the Occupational Health Physician. The Physical Standards Board may have the same membership as the local physician Credentials Committee or members may be designated for this purpose by the health

13

care facility Director to ensure objectivity. Boards may be conducted at other VA healthcare facilities.

   i)   The medical staff executive committee may request evaluation of practitioners privileged through the medical staff process in instances where there is doubt about an applicant's ability to perform the privileges requested.

p. Provides oversight and guidance for fee basis/contractual services.

q. Annually reviews and makes recommendations for approval of the Service-specific privilege lists.

2.  Meetings:

   a. Regular Meetings: Regular meetings of the Clinical Executive Board shall be held not less than 10 times per year. The date and time of the meetings shall be established by the Chair for the convenience of the greatest number of members of the Committee. The Chairmen of the various committees of the Medical Staff shall attend regular meetings of the Clinical Executive Board when necessary to report the activities and recommendations of their committees; and may attend at other times with the consent of the Chief of Staff. Such attendance shall not entitle the attendee to vote on any matter before the Clinical Executive Board.

   b. Emergency Meetings: Emergency meetings of the Clinical Executive Board may be called by the Chief of Staff to address any issue which requires action of the Committee prior to a regular meeting. The agenda for any emergency meeting shall be limited to the specific issue for which the meeting was called, and no other business may be taken up at an emergency meeting. In the event that the Chief of Staff is not available to call an emergency meeting of the Clinical Executive Board, the Director as the Governing Body or Acting Chief of Staff, acting for the Chief of Staff, may call an emergency meeting of the Committee.

   c. Meeting Notice: All Clinical Executive Board members shall be provided advance written notice of the time, date, and place of each regular meeting and reasonable notice, oral or written, of each emergency meeting.

   d. Agenda: The Chief of Staff, or in his absence, such other person as provided by these Bylaws, shall chair meetings of the Clinical Executive Board. The Chair shall establish the agenda for all meetings, and a written agenda shall be prepared and distributed prior to committee meetings.

   e. Quorum: A quorum for the conduct of business at any regular or emergency meeting of the Clinical Executive Board shall be a majority of the voting members of the committee, unless otherwise provided in these Bylaws. Action may be taken by majority vote at any meeting at which a quorum is present. The majority of the voting members must be fully licensed physicians of medicine or osteopathy.

   f. Minutes: Written minutes shall be made and kept on all meetings of the Clinical Executive Board and shall be open to inspection by Practitioners who hold membership or privileges on the Medical Staff. An Annual Report will be provided to Leadership Council.

   g. Communication of Action: The Chair at a meeting of the Clinical Executive Board at which action is taken shall be responsible for communicating such action to any person who is directly affected by it.

3.  The CEB Credentials Committee: will act and carry out all functions of the Credentials Committee as outlined in VA Handbook 5005 for recommendation to the Director. The members of the CEB Credentials Committee are:

   a. Chief of Staff, voting

   b. Deputy Chief of Staff, Chairperson, voting

   c. Chief, Dental Service, voting

   d. Chief, Imaging Service, voting

e. Chief, Geriatrics & Rehabilitation Service, voting

f. Chief, Mental Health Service, voting

g. Psychiatry Supervisor, Mental Health Service, voting

h. Representative, Pathology and Laboratory Medicine Service, voting

i. Chief, Specialty Service, voting

j. ACOS/Chief, Ambulatory Care, voting

k. Assistant Chief, Ambulatory Care, voting

l. Chief, Social Work, voting

m. Advance Practice Registered Nurse (APRN) Lead, ad hoc voting

n. Allied Health Staff (such as APRN, Psychologist, Pharmacist, etc.) as designated by Chief of Staff, non-voting

o. Other facility staff as may be called upon to serve as resources or attend committee meetings at the request of the chairperson, with or without vote (as determined by the CEB). For example, a Physician Assistant may be called to be present when an action affecting another Physician Assistant is being considered. Any member of the Medical Staff (with or without vote) is eligible for consideration.

4. Functions of the CEB Credentials Committee:  CEB Credentials Committee:

   a. Review and act on Medical Staff membership appointment and/or clinical privileges/clinical scope of practice applications and determine whether the applicant meets the requirements set forth in VA qualification standards and facility's expectations for credentialing and privileging based on education, training, professional experience, current competency, and other professional qualifications.

   b. Review completely an individual's qualifications for advancement or reappointment by an examination of the credentialing and privileging folder, FPPE/OPPE documents, supervisory evaluations, and other pertinent records, ensure ongoing evaluations of the competency of practitioners, and to make recommendations on their findings.

   c. Ensure that within 7 calendar days of the date a licensed healthcare professional leaves VA employment an Exit Review and Forever Evaluation is conducted.

   d. Conduct probationary and adverse action reviews for Medical Staff and Associate Medical Staff, as mandated or when necessary, providing oversight of the quality of care, treatment, and services delivered by practitioners who are credentialed and privileged through the Medical Staff process.

5. Meetings:

   a. Regular meetings of the CEB Credentials Committee shall be held bi-monthly for privilege consideration or at the call of the Chairperson.

   b. Meeting Notice: All CEB Credentials Committee members shall be provided advance written notice of the time, date, and place of each regular meeting and reasonable notice, oral or written, of each emergency meeting.

   c. Agenda: The Chief of Staff, or in his absence, such other person as provided by these Bylaws, shall chair meetings of the CEB Credentials Committee. The Chair shall establish the agenda for all meetings, and a written agenda shall be prepared and distributed prior to committee meetings.

15

d. Quorum: A quorum for the conduct of business at any regular or emergency meeting of the CEB Credentials Committee shall be a majority of the voting members of the committee, unless otherwise provided in these Bylaws. Action may be taken by majority vote at any meeting at which a quorum is present. **NOTE:** The definition of quorum as defined in the Bylaws must be followed and cannot be waived.

e. Minutes: Written minutes shall be made and kept on all meetings of the CEB Credentials Committee and shall be open to inspection by Practitioners who hold membership or privileges on the Medical Staff.

f. Communication of Action: The CEB Credentials Committee will make recommendations to the CEB who makes final recommendations to the Director.

## Section 5.03 Committees of the Medical Staff

1. The following Standing Committees hereby are established for the purpose of (a) evaluating and improving the quality of health care rendered, (b) reducing morbidity or mortality from any cause or condition, (c) establishing and enforcing guidelines designed to keep the cost of health care within reasonable bounds, (d) reviewing the professional qualifications of applicants for medical staff membership, (e) reviewing the activities of the Medical Staff, Advanced Practice Professional, and Allied Health Practitioners (f) reporting variances to accepted standards of clinical performance by, and in some cases to, individual Practitioners and (g) for such additional purposes as may be set forth in the charges to each committee. Additional committees along with local policies, rules, regulations, and membership are outlined and defined in VAIHCS Medical Center Memorandums and service level policy. Medical Staff Committees include but are not limited to the following.

   a. CITC Community Oversight Council
   b. Clinical Practice Management Committee
   c. Compounding Sterile Products Advisory Committee
   d. Disruptive Behavior Committee
   e. Fugitive Felon Committee
   f. Geriatric Multidisciplinary Committee
   g. Infection Control Committee
   h. Medical Records Committee
   i. Multidisciplinary Oversight Committee for Special Care Units Operating Room Committee
   j. Pain Management Committee
   k. PAVE (Preservation of Amputation for Veterans Everywhere) Committee
   l. Pharmacy, Nutrition and Therapeutics Committee
   m. Credentials Committee
   n. Residency Review Committee
   o. Surgical Workgroup
   p. Transfusion Utilization Committee
   q. VIST
   r. Women's Health Committee
   s. Radiology Quality Improvement Committee

2. Information Flow to the Clinical Executive Board: All Medical Staff Committees, including but not limited to those listed above, will submit minutes of all meetings to the Clinical Executive Board (CEB) in a timely fashion after the minutes are approved and will submit such other reports and documents as required and/or requested by the CEB.

### Section 5.04 Committee Records and Minutes

1. Committees prepare and maintain reports to include data, conclusions, recommendations, responsible person, actions taken, and evaluation of results of actions taken. These reports are to be forwarded in a timely manner through channels established by the Medical Staff, at a minimum on a quarterly basis.

2. Each Committee provides appropriate and timely feedback to the Services relating to all information regarding the Service and its providers.

3. Each committee shall review and forward to the CEB, a synopsis of any subcommittee and/or workgroup findings.

### Section 5.05 Establishment of Committees

1. The Clinical Executive Board may, by resolution and upon approval of the Director, without amendment of these Bylaws, establish additional standing or special committees to perform one or more Medical Staff functions.

2. The Clinical Executive Board may, by resolution and upon approval of the Director, dissolve or rearrange committee structure, duties, or composition as needed to better accomplish Medical Staff functions.

## ARTICLE VI.  MEDICAL STAFF MEETINGS

1. Regular Meetings: Regular meetings of the Medical Staff shall be held at least annually. A record of attendance shall be kept.

2. Special Meetings: Special meetings of the Medical Staff may be called at any time by the Chief of Staff or at the request of the Director or the Clinical Executive Board. At any such meeting, only that business set forth in the notice thereof will be transacted. Notice of any such meeting shall be deemed sufficient if it is given in writing to the Medical Staff at least forty-eight (48) hours prior thereto. Members of the Medical Staff may request a special meeting either through the Chief of Staff or Director in writing and stating the reason(s) for the request.

3. Quorum: For purposes of Medical Staff business, fifty-one (51) percent of the total membership of the medical staff membership entitled to vote constitutes a quorum.

4. Meeting Attendance: Members of the Organized Medical Staff are required to attend at least one meeting of regular Medical Staff meetings and will attend their service staff meetings monthly and meetings of committees of which they are members unless specifically excused by the Service Chief for appropriate reasons, e.g., illness, leave or clinical requirements. Attendance is documented in the minutes.

## ARTICLE VII.  APPOINTMENT AND ONGOING CREDENTIALING *

### Section 7.01 General Provisions

1. Independent Entity: VA Illiana Health Care System is an independent entity, granting privileges to the medical staff through the Executive Committee of the Medical Staff and Governing Body as defined in these Bylaws. Credentialing and privileging are performed prior to initial appointment. Medical Staff, Advanced Practice Professional, and Allied Health Practitioner reappointments may not exceed 2 years, minus one day from the date of last appointment or reappointment date.

17

Medical Staff and Advanced Practice Professional and Allied Health Practitioners must practice under their privileges or scope of practice.

2. Credentials Review: All Licensed Independent Practitioners (LIP), and all Advanced Practice Professional and Allied Health Practitioners who hold clinical privileges or scope of practice will be subjected to full credentials review at the time of initial appointment and reappraisal for granting of clinical privileges and after a break in service. All Advanced Practice Professionals and Allied Health Practitioners will be subjected to full credentials review at the time of initial appointment, appraisal, or reappraisal for granting a scope of practice if credentialed through the Medical Staff process, as outlined in VHA Handbook 1100.19, Credentialing & Privileging. Credentials that are subject to change during leaves of absence shall be reviewed at the time the individual returns to duty. Practitioners are appointed for a maximum period of 2 years.

3. Deployment/Activation Status:

   a. When a member of the medical staff has been deployed to active duty, upon notification, the privileges will be considered in a "Deployment/Activation Status" and the credentialing file will remain active. The Deployment/Activation status must be documented for informational purposes in the Medical Executive Committee minutes. Upon return of the Practitioner from active duty, in accordance with the Uniformed Services Employment and Reemployment Rights Act of l994 (USERRA), the Practitioner will update the credentialing file to current status.

   b. After verification of the updated information is documented, the information will be referred to the Practitioner's Service Chief then forwarded to the CEB Credentials Committee for recommendation to restore privileges to active, current status, based on evidence of current competence. The Director has final approval for restoring privileges to active and current status. The service chief and Medical Executive Committee should consider putting a FPPE in place to confirm clinical current competence depending upon the length of time away from the facility or other circumstances.

   c. In those instances where the privileges lapsed during the call to active duty, the Practitioner must request privileges and submit information required for re-credentialing prior to appointment.

   d. In those instances where the Practitioner was not providing clinical care while on active duty, the Practitioner in cooperation with the Service Chief must consider the privileges held prior to the call to active duty and whether a request for modification of these privileges should be initiated, on a short-term basis. These providers may be returned to a pay status, but may not be in direct patient care.

4. Employment or Contract: Appointments to the Medical Staff occur in conjunction with VHA employment or under a VHA contract or sharing agreement. The authority for these actions is based upon:

   a. Provisions of 38 U.S.C. 7401 in accordance with VA Handbook 5005, Part II, Chapter 3, VHA Handbooks and applicable Agreement(s) of Affiliation in force at the time of appointment.

   b. Federal law authorizing VA to contract for health care services.

5. Initial Focused Professional Practice Evaluation:

   a. The initial focused professional practice evaluation (FPPE) is a process whereby the Medical Staff evaluates the privilege-specific competence of a Practitioner who does not have documented evidence of competently performing the requested privilege at the organization. This occurs with a new Practitioner or an existing Practitioner who request a new privilege. The performance monitoring process is defined by each Service and must include;

      i)   Criteria for conducting performance monitoring

      ii)  Method for establishing a monitoring plan specific to the requested privilege

      iii) Method for determining the duration (time or volume based) of the performance monitoring

      iv)  Circumstances under which monitoring by an external source is required.

v) Method/Benchmarks for reporting successful completion of FPPE to be reported through the CEB Credentials Committee to Medical Executive Committee (CEB) for closure of FPPE and transition to OPPE.

b. Information resulting from the FPPE process will be integrated into the service specific performance improvement program (non-Title 38 U.S.C. 5705 protected process), consistent with the Service's policies and procedures.

c. If at any time the Service Chief or designee cannot determine the competence of the Practitioner being evaluated during the FPPE process, one or more of the following may occur at the discretion of the Service Chief:

   i) Extension of FPPE review period

   ii) Modification of FPPE criteria

   iii) Privileges (initial or additional) may not be maintained (appropriate due process will be afforded to the Practitioner)

   iv) Revocation or Reduction of existing privileges (appropriate due process will be afforded to the Practitioner and will be appropriately managed through Employee Relations and, if a physician or dentist, reported to the National Practitioner Data Bank.)

d. The FPPE process is required for all providers, including Physician Assistants, Clinical Pharmacists, and Contract ARNPs, who are on scopes of practice but are credentialed in accordance with VHA Handbook 1100.19, "Credentialing and Privileging" and Medical Staff Bylaws.

e. An initial Medical Staff appointment does not equate to HR employment. FPPE does not equate to a probationary period. The FPPE is separate and distinct from the HR probationary review listed below;

   i) Initial and certain other appointments made under 38 U.S.C. 7401(l), 7401(3), 5 U.S.C. 3301 are probationary. During the probationary period, professional competence, performance, and conduct will be closely evaluated under applicable VA policies, procedures, and regulations.

   ii) If, during this period, the employee demonstrates an acceptable level of performance and conduct, the employee will successfully complete the probationary period. Supervisors and managers apply the same processes to the evaluation of individuals employed under provision of 38 U.S.C. 7405 and those utilized under contracts and sharing agreements.

   iii) To improve performance, any findings, conclusions, recommendations or actions are communicated to the appropriate staff by their respective supervisor.

6. Ongoing Professional Practice Evaluation:

   i.) The on-going monitoring of privileged practitioners is essential to confirm the quality of care delivered. This is called the Ongoing Professional Practice Evaluation (OPPE). This allows the facility to identify professional practice trends that impact the quality of care and patient safety. This evaluation will be done according to the provision of the VAIHCS Medical Center Memorandum on OPPE (MCM 11-88). OPPE will occur at minimum every six months for each professional member of the Medical Staff and will evaluate the six domains of professional competencies including Patient Care, Medical/Clinical Knowledge, Practice-Based Learning and Improvement, Interpersonal and Communication Skills, Professionalism, and System-Based Practice. Each departmental plan will include defined standards of proficiency and triggers for focused professional practice evaluation. With very few exceptions, VHA data standing alone is not protected by 38 U.S.C. 5705. Its use would dictate the appropriate protections under law. Data that generates documents used to improve the quality of health care delivered or the utilization of health care resources is protected by 38 U.S.C. 5705. Data that is not previously identified as protected by 38 U.S.C. 5705 and is collected as provider-specific data could become part of a practitioner's

provider profile, analyzed in the facility's defined on-going monitoring program, and compared to pre-defined facility triggers or de-identified quality management data. To improve performance, any findings, conclusions, recommendations or actions are communicated to the appropriate staff by their respective supervisor.

ii.) In those instances where a practitioner does not meet established criteria, the service chief has the responsibility to document these facts. These situations can occur for a number of reasons and do not preclude a service chief recommending the renewal of privileges, but the service chief must clearly document the basis for the recommendation of renewal of privileges.

iii.) The CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) must consider all information available, including the service chief's recommendation and reasons for renewal when criteria have not been met, prior to making their recommendation for the granting of privileges to the Director. This deliberation must be clearly documented in the minutes.

iv.) The Director shall weigh all information available, as well as the recommendations, in the determination of whether or not to approve the renewal of privileges and document this consideration.

v.) The OPPE process is required for all providers, including Physician Assistants, Clinical Pharmacists, and Contract ARNPs, who are on scopes of practice but are credentialed in accordance with VHA Handbook 1100.19, "Credentialing and Privileging" and Medical Staff Bylaws.

## Section 7.02 Application Procedures *

1. Completed Application: An initial Medical Staff Appointment does not equate to HR employment. FPPE does not equate to a probationary period. The FPPE is separate and distinct from the HR probationary review listed below;

   a. Initial and certain other appointments made under 38 U.S.C. 7401(I), 7401 (3), 5 U.S.C. 3301 are probationary. During the probationary period, professional competence, performance, and conduct will be closely evaluated under applicable VA policies, procedures, and regulations.

   b. If, during this period, the employee demonstrates an acceptable level of performance and conduct, the employee will successfully complete the probationary period.

2. Applicants for appointment to the Medical Staff must submit a complete application on prescribed electronic forms and paper forms that are signed by the applicant via wet ink or approved digital signature. The applicant must submit credentialing information through VetPro as required by VHA guidelines. The applicant is bound to be forthcoming, honest and truthful (1100.19 page 9). To be complete, applications for appointment must be submitted by the applicant on forms approved by the VHA, entered into the internet-based VHA VetPro credentialing database, and include authorization for release of information pertinent to the applicant and information listed below. The applicant has the right to correct any information that is factually incorrect by documenting the new information with a comment that the previously provided information was not correct. Follow-up with the verifying entity is necessary to determine the reason for the discrepancy if the Practitioner says the information provided is factually incorrect.

   a. Items specified in Article III, Section 2, Qualifications for Medical Staff Membership, including:

      i) Active, Current, Full, and Unrestricted License

      ii) Education.

      iii) Relevant training and/or experience.

      iv) Current professional competence and conduct.

v) Physical and Mental health status.

vi) English language proficiency.

vii) Professional liability insurance (contractors only).

viii) BLS and/or ACLS as required by MCM 11-44 Basic Life Support and Advance Life Support Training Requirements (See also VHA Directive 2011-044, Cardiopulmonary Resuscitation Basic and Advanced Cardiac Life Support Training for Staff). The only accepted agencies for BLS and ACLS are identified in the MCM. Prior to assuming clinical duties, new providers must supply evidence of current certification in BLS and/or ACLS as required by VHA policy. Provider must maintain certification in order to continue provision of clinical duties as required by VHA policy.

ix) To qualify for moderate sedation and airway management privileges, the Practitioner will have specific, approved clinical privileges according to MCM 112-08 and will comply with VHA "The Sedation and Analgesia by Non-Anesthesia Providers" policy.

b. U.S. Citizenship: Applicants must be citizens of the United States. When it is not possible to recruit qualified citizens, Practitioners otherwise eligible for Medical Staff appointment who are not citizens will be eligible for consideration for appointment with proof of current visa status and Immigration and Naturalization Service documentation regarding employment authorization, pursuant to qualifications as outlined in 38 U.S.C. 7405 and VA Handbook 5005, Part II, Chapter 3.

c. References: The names and addresses of four individuals who are qualified to provide authoritative information regarding training/experience, current clinical competence, health status and/or fulfillment of obligations as a Medical Staff member within the privileges requested are required. At least one of the references must come from the current or most recent employer or for individuals completing a residency; one reference must come from the residency training program director. The Facility Director may require additional information.

d. Previous Employment: A list of all health care institutions or other organizations where the Practitioner is/has been appointed, utilized or employed (held a professional appointment), including:

   i) Name of health care institution or practice.

   ii) Term of appointment or employment and reason for departure.

   iii) Privileges held and any disciplinary actions taken or pending against privileges, including suspension, revocation, limitations, or voluntary surrender.

e. DEA/CDS Registration: A description of:

   i) Status, either current or inactive.

   ii) Any previously successful or currently pending challenges to, or the voluntary relinquishment of, the Practitioner's DEA/CDS registration.

f. Sanctions or Limitations: Any sanction or penalty by any licensing authority, including current pending challenges, whether a license or registration ever held to practice a health occupation by the Practitioner has been suspended, revoked, voluntarily surrendered, or not renewed.

g. Liability Claims History: Status (Open, Pending, Closed, Dismissed, etc.) of any claims made against the Practitioner in the practice of any health occupation including final judgments or settlements, if available.

h. Loss of Privileges: Voluntary or involuntary termination of Medical Staff membership or voluntary or involuntary limitation, reduction, or loss of clinical privileges at another health care facility.

i. Release of Information: Authorization for release of information, including written consent to the inspection of records and documents pertinent to applicant's licensure, training, experience, current competence, and health status.

21

j.  Pending Challenges: Pending challenges against the Practitioner by any hospital, licensing agency, professional group, or society.

3.  Primary Source Verification: In accordance with VHA Handbook 1100.19 Credentialing and Privileging and VA Handbook 5005, Part II, Chapter 3 the facility will obtain primary source verification of:

   a.  A minimum of three (3) references for initial credentialing, and two (2) for re-credentialing, from individuals able to provide authoritative information regarding information as described in Article VIII, Section 8.02.

   b.  Verification of current or most recent clinical privileges held, if available.

   c.  Verification of status of all licenses current and previously held by the applicant.

   d.  Evidence and verification of the ECFMG (Educational Commission for Foreign Medical Graduates) certificate for foreign medical graduates, if claimed.

   e.  Evidence and verification of board certification or eligibility, if applicable.

   f.  Verification of education credentials used to qualify for appointment including all postgraduate training.

   g.  Evidence of registration with the National Practitioner Data Bank (NPDB) Continuous Query Update, for all members of the Medical Staff and those Practitioners with clinical privileges.

   h.  For all physicians screening will be accomplished through the Federation of State Medical Boards (FSMB) Physician Data Center. This screening will report all licenses known to FSMB ever held by the physician. If the screen results in a disciplinary alert, primary source information from the State licensing board for all actions related to the disciplinary alert as well as a statement from the Practitioner.

   i.  Confirmation of health status on file as documented by a physician approved by the Organized Medical Staff.

   j.  Evidence and verification of the status of any alleged or confirmed malpractice.

   k.  The applicant's agreement to provide continuous care and to accept the professional obligations defined in the Medical Staff Bylaws, Rules, and Regulations for the facility to which the application is being made.

4.  The applicant's attestation to the accuracy and completeness of the information submitted.

5.  Burden of Proof: The applicant has the burden of obtaining and producing all needed information for a proper evaluation of the applicant's professional competence, character, ethics, and other qualifications. The information must be complete and verifiable. The applicant has the responsibility for furnishing information that will help resolve any doubts concerning such qualifications. Failure to provide necessary information within 30 days of the request to the applicant may serve as a basis for denial of employment consideration.

6.  VetPro Required: All healthcare providers must submit credentialing information into VetPro as required by VHA policy.

### Section 7.03 Process and Terms of Appointment *

1.  Chief of Service Recommendation: The Chief of the Service is responsible for recommending appointment to the Medical staff based on evaluation of the applicant's completed application, credentials, demonstrated competency, and a determination that Service criteria for clinical privileges are met.

2.  CMO Review: In order to ensure an appropriate review is completed in the credentialing process the applicant's file must be submitted to the VISN Chief Medical Officer (CMO) for review and recommendation as to whether to continue the appointment and privileging process prior to presentation to the CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) if

2:25-cv-02098-CSB-EIL # 1-2 Filed: 04/03/25 Page 27 of 57

the response from the NPDB query indicates that any of the following criteria is met: There have been, for or on behalf of the applicant, (a) three or more medical malpractice payments, (b) a single medical malpractice payment of $550,000 or more, or (c) two medical malpractice payments totaling $1,000,000 or more. The higher-level review by the VISN CMO is to assure that all circumstances, including the individual's explanation of the specific circumstances in each case, are weighed against the primary source verification and that the appointment is still appropriate. The VISN CMO may consult with Regional Counsel as needed to determine the appropriate documents for primary source verification of the basis for medical malpractice payments. The VISN CMO review will be documented on the Service Chief's Approval screen in VetPro as an additional entry. Review by the CMO is also required for applicants for initial appointment who have had any licensure actions or may have any pending licensure actions.

3. CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) recommends Medical Staff appointment based on evaluation of credentials of each applicant and a determination that Medical Staff criteria for clinical privileges are met.

4. Director Action: Recommended appointments to the Medical Staff should be acted upon by the Director within 30 calendar days of receipt of a fully complete application, including all required verifications, references and recommendations from the appropriate Service Chief and CEB Credentials Committee to the Executive Committee of the Medical Staff (CEB).

5. Applicant Informed of Status: Candidates for appointment who have submitted complete applications as defined by these Bylaws will receive written notice of appointment or non-appointment, or return of the application because of inadequate information. In the event that the appointment is not approved, reasons will be provided to the applicant.

## Section 7.04 Credentials Evaluation and Maintenance *

1. Evaluation of Competence: Determination will be made (through evaluation of all credentials, peer recommendations, available quality of care information including Medical Staff monitors) that the Practitioner applying for clinical privileges has demonstrated current competence in professional performance, judgment and clinical and/or technical skill to practice within clinical privileges requested.

2. Good Faith Effort to Verify Credentials: A good faith effort will be made to verify, with primary sources, all credentials claimed. A good faith effort to verify is defined as successful verification, or satisfactory evidence, that verification is not possible (records destroyed, health care institution closed, private practice partner deceased, etc.). When it is not possible to obtain documentation, an entry will be placed in the file stating the reason and a secondary source will be sought. The entry will describe the effort made to obtain the information with dates and signature of the individual(s) responsible for the effort. It will also indicate when a secondary source, e.g. copy of diploma, confirmation from someone in practice or training at the same time, is being used in lieu of primary-source verification. The applicant should assist in providing required information for this documentation.

3. Maintenance of Files: A complete and current Credentialing and Privileging (C&P) file including the electronic VetPro file will be established and maintained for each provider requesting privileges. Maintenance of the C&P file is the responsibility of the Chief of Staff. Any time a file is found to lack required documentation, without an entry as noted above in paragraph 2 describing the efforts made to obtain the information, effort will be made to obtain the documentation.

4. Focused Professional Practice Evaluation: A Focused Professional Practice Evaluation (FPPE) will be initiated at time of initial appointment, at the time of request for additional privileges, or in case of a "for-cause" event requiring a focused review. (MCM 11-88 Focused Professional Practice Evaluation)

   a. A FPPE, implemented at time of initial appointment, will be based on the Practitioner's previous experience and competence. The evaluation can be defined as comprising a specific time frame, number of procedures or cases, chart reviews, etc. and should be discussed with the Practitioner by the Service Chief.

b. A FPPE at the time of request for additional privileges will be for a period of time, a number of procedures, and/or chart review to be set by the Service Chief.

c. A FPPE initiated by a "for-cause" event (any issue affecting the provision of safe, high-quality patient care) will be set by the Service Chief. FPPE for cause, where there is concern regarding competence and the care being rendered to patients, may require direct supervision and appropriate action on privileges i.e., summary suspension. The decision to implement a FPPE is based on the evaluation of a practitioner's current clinical competence, practice behavior, and ability to perform the requested privilege.

d. The FPPE monitoring process (as outlined in MCM 11-88) will clearly define and include the following:

   i) Criteria for conducting performance monitoring.

   ii) Method for establishing a monitoring plan specific to the requested privilege.

   iii) Method for the determining the duration of performant monitoring.

   iv) Circumstances under which monitoring by an external source is required.

e. Information resulting from the FPPE process will be integrated into the service specific performance improvement program (non-Title 38 U.S.C. 5705 protected process), consistent with the Service's policies and procedures.

f. If at any time the Service Chief or designee cannot determine the competence of the Practitioner being evaluated during the FPPE process, one or more of the following may occur at the discretion of the Service Chief with the approval of Chief of Staff:

   i) Extension of FPPE review period

   ii) Modification of FPPE criteria

   iii) Privileges (initial or additional) may not be maintained (appropriate due process will be afforded to the Practitioner)

   iv) Termination of existing privileges (appropriate due process will be afforded to the Practitioner and will be appropriately terminated and reported)

### Section 7.05 Local/VISN-Level Compensation Panels

Local VISN-level Compensation Panels recommend the appropriate pay table, tier level and market pay amount for individual medical staff members, as outlined in VA Handbook 5007, Part IX/21. Appointment actions recommended by the CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) require a separate review for a pay recommendation by the appropriate Compensation Panel.

## ARTICLE VIII CLINICAL PRIVILEGES *

### Section 8.01 General Provisions

1. Clinical privileges are granted for a period of no more than 2 years.

2. Reappraisal of privileges is required of each Medical Staff member and any other Practitioner who has clinical privileges. Reappraisal is initiated by the Credentialing Department with renewal packet sent to individual Practitioners prior to expiration date.

   a. Although the reappraisal process occurs biennially, ongoing professional practice evaluation is designed to continuously evaluate a Practitioner's performance.

   b. Reappraisal requires documentation of satisfactory completion of sufficient continuing education to satisfy state licensure and Medical Staff requirements. Evidence of formal documentation may be requested of the provider.

24

c. For initial and reappointment, all time-limited credentials, including peer appraisals must be current within 180 days of submission of the application. The term current applies to the timeliness of the verification and use for the credentialing and privileging process. If the delay between the candidate's application and appointment, reappointment or reporting for duty is greater than 180 calendar days, the candidate must update all time-limited credentials and information, including but not limited to licensure, current competence, and supplemental questions. The updated information must be verified prior to consideration by the Executive Committee of the Medical Staff. The verification date of a time-limited credential cannot be more than 120 days prior to the effective date of the privileges (1100.19 page 7).

3. A Practitioner may request modification of existing clinical privileges by submitting a formal request for the desired change(s) with full documentation to support the change to the Service Chief

4. Allied Health, Advanced Practice Professionals who are permitted by law and the facility to provide patient care services may be granted scope of practice, clinical privileges and/or prescriptive authority based on their assignments, responsibilities, qualifications, and demonstrated competence.

5. Requirements and processes for requesting and granting privileges are the same for all Practitioners who seek privileges regardless of the type of appointment or utilization authority under which they function, their professional discipline, or position.

6. Practitioners with clinical privileges are approved for and have clinical privileges in one clinical Service but may be granted clinical privileges in other clinical Services. Clinical privileges granted extend to all physical locations of the designated Service(s) within the jurisdiction of the organization and its patient service area. In those instances where clinical privileges cross to a different designated service, all Service Chiefs must recommend the practice.

7. Exercise of clinical privileges within any Service is subject to the rules of that Service and to the authority of that Service Chief.

8. When certain clinical privileges are contingent upon appointment to the faculty of an affiliate, loss of faculty status results in termination of those privileges specifically tied to the faculty appointment.

9. Telemedicine: All Practitioners involved in the provision of telemedicine are subject to all existing requirements for credentialing and privileging, as identified in VHA Handbook 1100.19, Credentialing and Privileging. This handbook is on file in the Credentialing and Privileging Office of the Chief of Staff. This includes the option of "privileging by proxy" in accordance with VHA policy and Joint Commission standards. When this option is utilized, the facility may use the credentialing and privileging decision from the site providing care if the provider is fully credentialed and privileged at that site and a formal agreement is in place, i.e., a Memorandum of Understanding which outlines the arrangement including services to be received and bilateral communication of quality of care concerns, including at minimum, all adverse outcomes.

10. Teleconsultation: All Practitioners providing teleconsultation services are subject to existing requirements for credentialing and privileging, as identified in VHA Handbook 1100.19, Credentialing and Privileging. This handbook is on file in the Credentialing and Privileging Office of the Chief of Staff.

## Section 8.02 Process and Requirements for Requesting Clinical Privileges *

1. Burden of Proof: When additional information is needed, the Practitioner requesting clinical privileges must furnish all information and other supporting documents needed for a proper evaluation of qualifications, professional competence, conduct, and ethics. The information must be complete, accurate, and verifiable. If questions arise, the requesting Practitioner is responsible for furnishing information to clarify concerns or issues on qualifications. Failure to provide necessary information within 30 days of request may result in denial of clinical privileges.

2. Requests in Writing: All requests for clinical privileges must be made in writing by the Practitioner and include a statement of the specific privileges being requested in a format approved by the Medical Staff.

3. Credentialing Application: The Practitioner applying for initial clinical privileges must submit a complete application for privileges that includes:

   a. Complete appointment information as outlined in Section 2 of Article VI.

   b. Application for clinical privileges as outlined in this Article.

   c. Evidence of professional training and experience in support of privileges requested.

   d. A statement of the Practitioner's physical and mental health status as it relates to Practitioner's ability to function within privileges. This must be confirmed by a physician acceptable to the Organized Medical Staff. Reasonable evidence of health status may be required by the Executive Committee of the Medical Staff.

   e. A statement of the current status of all licenses and certifications held.

   f. A description of any and all (1) sanctions, including those by a hospital, state licensing agency or any other professional health care organization/professional organization/society; (2) voluntary or involuntary relinquishment of licensure or registration; (3) malpractice claims, suits or settlements (e.g. final judgment or settlements); and (4) reduction or loss of privileges at any other hospital within 15 days of the adverse action.

   g. Names of other hospitals at which privileges are held and requests for copies of current privileges held.

   h. Names and addresses of peer references qualified to provide authoritative information regarding training, experience, competence, health status, and fulfillment of obligations as a Medical Staff member within the privileges requested.

   i. Evidence of successful completion of an approved BLS and/or ACLS (as required) program meeting the criteria of the American Heart Association (or others as indicated in Medical Center Memorandum 11-44, Basic Life Support and Advance Cardiac Life Support Training Requirements).

   j. Prior to assuming clinical duties, new providers must supply evidence of current certification in BLS and/or ACLS as required by VHA Policy. Provider must maintain certification in order to continue provision of clinical duties as required by VHA Policy.

4. Bylaws Receipt and Pledge: Prior to the granting of clinical privileges, Medical Staff members or applicants must pledge to provide for continuous care of their patients and agree to abide by the professional obligations in accordance with the Bylaws and Rules. This attestation must be made in VetPro before the provider can submit their application for appointment or privileges. If the Bylaws are updated between credentialing cycles, the Practitioner will be asked to attest to compliance with the recently approved version of the Bylaws through a mechanism outside of VetPro.

5. Moderate Sedation and Airway Management: To qualify for moderate sedation and airway management privileges, the Practitioner must have specific, approved clinical privileges and comply with VHA Sedation and Analgesia by Non-Anesthesia Providers policy and agree to the guidelines outlined in the policy. (MCM 112-08, Policy on the Use of IV Sedatives)

## Section 8.03 Process and Requirement for Requesting Renewal of Clinical Privileges *

1. Application: The Practitioner applying for renewal of clinical privileges must submit the following information:

   a. An application for clinical privileges as outlined in Section 2 of this Article. This includes submission of the electronic re-credentialing application through VetPro. Since practice, techniques, and facility missions change over time, it is expected that modifications, additions, or deletions to existing clinical privileges will occur over time. Practitioners are encouraged to consider carefully and discuss the appropriateness of specific privileges with the appropriate Service Chief prior to formal submission of privilege requests.

   b. Supporting documentation of professional training and/or experience not previously submitted.

26

c. A statement of the Practitioner's physical and mental health status as it relates to Practitioner's ability to function within privileges. This must be confirmed by a physician acceptable to the Organized Medical Staff. Reasonable evidence of health status may be required by the Executive Committee of the Medical Staff.

d. Documentation of continuing medical education related to area and scope of clinical privileges, (consistent with minimum state licensure requirements) not previously submitted.

e. A statement of the current status of all licenses, licenses previously held which have lapsed since last appointment, and certifications held. The status of all licenses and certifications must be validated. This applies to licenses held in multiple states for the same professional discipline or practice.

f. A description of any and all (1) sanctions, including those by a hospital, state licensing agency or any other professional health care organization/professional organization/society; (2) voluntary or involuntary relinquishment of licensure or registration; (3) malpractice claims, suits or settlements (e.g. final judgment or settlements); and (4) reduction or loss of privileges at any other hospital within 15 days of the adverse action.

g. Names and addresses of two peers who are qualified to provide authoritative information regarding medical/clinical knowledge, technical and clinical skills, clinical judgment, interpersonal skills, communication skills and professionalism as a Medical Staff member within the privileges requested.

h. Names of other hospitals or facility at which privileges are held and requests for copies of current privileges held.

2. Verification: Before granting subsequent clinical privileges, the Credentialing and Privileging Office will ensure that the following information is on file and verified with primary sources, as applicable:

a. Current and previously held licenses in all states.

b. Current and previously held DEA/State CDS registration.

c. NPDB-Continuous Query Registration.

d. FSMB query, if there was a break in service between re-credentialing cycles

e. Physical and mental health status information from applicant.

f. Physical and mental health status confirmation.

g. Professional competence information from peers and Service Chief, based on results of ongoing professional practice monitoring and FPPE.

h. Continuous education to meet any local requirements for privileges requested.

i. Board certifications, if applicable.

j. Quality of care information.

3. Bylaws Receipt and Pledge: Prior to the renewal of clinical privileges, Medical Staff members or applicants must pledge to provide for continuous care of their patients and agree to abide by the professional obligations in accordance with the Bylaws and Rules. This attestation must be made in VHA's electronic credentialing system before the provider can submit their application for appointment or privileges.

### Section 8.04 Processing an Increase or Modification of Privileges *

1. A Practitioner's request for modification to, existing clinical privileges is initiated by the Practitioner's submission of a formal request for the desired change(s) with full documentation to support the change to the Clinical Service Chief. This request will initiate the modification process as noted in the VHA Handbook 1100.19.

27

2. Primary source verification is conducted as required for re-credentialing if applicable, e.g. provider attests to additional training.

3. Current NPDB-Continuous Query Registration prior to rendering a decision.

4. A modification to, existing clinical privileges requires the approval of the Executive Committee of the Medical Staff followed by the Director's approval.

5. Administrative Modifications (reduction) of privileges should be pursued when a Practitioner is changing their clinical duties at the facility so that their current privileges reflect current expected practice. Examples would be a change of position, facility no longer providing identified procedures, closure of a clinical program, or low volume and no expectation to perform procedure in the foreseeable future. These modifications are administrative in nature and are not to be considered adverse action thus they are not reportable to NPDB. Initiation of an Administrative Modification may be made by the Practitioner or the Facility. The change should be supported by the service chief and reported to the Medical Executive Committee for concurrence. The provider should be notified in writing of the Administrative Modification to include the specific privileges being administratively reduced, the reason, and confirmation that the action is not considered adverse or reportable. This should not be utilized if there is concern of the Practitioner's clinical practice. Clinical concerns must be addressed through other procedures outlined in this document.

## Section 8.05 Recommendations and Approval for Initial/Renewal, Modification/Revision of Clinical Privileges *

1. Peer recommendations from individuals who can provide authoritative information regarding medical/clinical knowledge, technical and clinical skills, clinical judgement, interpersonal skills, communication skills, professionalism and health status are required.

2. The Service Chief where the applicant is requesting clinical privileges is responsible for assessing all information and making a recommendation regarding whether to grant the clinical privileges.

    a. Recommendations for initial, renewal or modification of privileges are based on a determination that applicant meets criteria for appointment and clinical privileges for the Service including requirements regarding education, training, experience, references and health status. Consideration will also be given to the six core competencies in making recommendations for appointment. The same six core competencies are considered for both initial appointment and reappointment. The core competencies are:

        i) Medical/Clinical knowledge

        ii) Interpersonal and Communication skills

        iii) Professionalism.

        iv) Patient Care.

        v) Practice-based Learning & Improvement.

        vi) System-based Practice.

    b. Recommendation for clinical privileges subsequent to those granted initially are based on reappraisal of physical and mental health status, peer recommendations, continuing education, professional performance, judgment, clinical and/or technical skills and quality of care including results of monitoring and evaluation activities (such as surgical case review, drug usage evaluation, medical record review, blood usage review, medication use review, monitoring and evaluation of quality and appropriateness of clinical aspects of patient treatment and risk management activities, and OPPE.) Upon renewal of privileges, when insufficient practitioner specific data is unavailable, the medical staff obtains and evaluates peer recommendations.

3. The CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) recommends granting clinical privileges to the Facility Director (Governing Body) based on each applicant successfully meeting the requirements for clinical privileges as specified in these Bylaws. A subcommittee of the Executive Committee of the Medical Staff can make the initial review and

28

recommendation, but this information must be reviewed and approved by the Executive Committee of the Medical Staff.

4.  The Application for appointment and clinical privileges are acted upon by the Director within 30 calendar days of receipt of the Executive Committee of the Medical Staff recommendation to grant/deny the requested privileges and appointment as recommended. The Director's action must be verified with an original signature.

5.  Originals of approved clinical privileges are placed in the individual Practitioner's Credentialing and Privileging File. A Copy of approved privileges are given to the Practitioner and are readily available to appropriate staff for comparison with Practitioner procedural and prescribing practices. In the case of privilege denial, the applicant is informed of the reason for the denial.

6.  Clinical functions/collaborative practice agreement applications for Advanced Practice Professionals follow the Medical Staff process.

7.  Dissemination of information related to granting, modification, or restriction decisions are approved by the organized medical staff and is disseminated and made available to all appropriate internal and external persons or entities as outlined in VHA Handbook 1100.19

## Section 8.06 Exceptions*

1.  Emergency Care: Emergency care may be provided by any individual who is a member of the Medical Staff or who has been granted clinical privileges, within the scope of the individual's license, to save a patient's life or save the patient from serious harm. Once imminent danger has passed, the care of the patient should be transferred as appropriate. Emergency care may also be provided by properly supervised residents of the facility's affiliated residency training programs. Expedited Privileges are not processed at VAIHCS.

2.  Disaster Privileges:

    a.  Disaster privileges may be granted only when the emergency management plan has been activated; and the facility is unable to handle the immediate patient needs.

        i)   In circumstances of disaster(s) in which the disaster management plan has been activated, the Director or the Chief of Staff or their designee(s) may grant disaster privileges. Granting of disaster privileges will follow guidelines set in Medical Center Memorandum 11-53, Credentialing and Privileging. The disaster privileges will be granted for 10 days or for the length of the disaster or emergency situation whichever is shorter. Within this 10-day period, the organization will make a decision on the continuation of the disaster privileges.
        ii)  Based on its oversight of each volunteer LIP, the hospital will determine within 72 hours of the practitioner's arrival if granted disaster privileges should continue.

3.  Inactivation of Privileges: The inactivation of privileges occurs when a Practitioner is not an actively practicing member of the medical staff for an extended period of time such as extended sick leave or sabbatical with or without clinical practice while on sabbatical. Inactivation of privileges for this purpose is administrative and should only be done when there is no concern of substandard care, professional misconduct, or professional incompetence.

    a.  When the Practitioner returns to the Facility, credentialing and privileging activities are similar to the initial credentialing process with the exception that non-time limited information, e.g., education and training, does not need to be verified again. Inactivation of privileges may not be used as a substitute for termination of medical staff appointment and/or revocation of privileges where such action(s) is warranted.

    b.  The inactivation should be reported for informational purposes to the CEB Credentials Committee to Executive Committee (CEB) with confirmation that the inactivation was not due to substandard care, professional misconduct, or professional incompetence.

c. At the time of inactivation of privileges, including separation from the medical staff, the Facility Director ensures that within 7 calendar days of the date of separation, information is received suggesting that Practitioner met generally accepted standards of clinical practice and there is no reasonable concern for the safety of patients in accordance with VHA Handbook 1100.18.

d. Deployment and Activation Privilege Status: In those instances where a Practitioner is called to active duty, the Practitioner's privileges are documented for information purposes in the CEB Credentials Committee to Executive Committee (CEB) minutes as being placed in a Deployment and/or Activation Status. The credential file remains active with the privileges in this new status. If at all possible, the process described below for returning privileges to an active status is communicated to the Practitioner before deployment.

e. Facility staff request that a Practitioner returning from active duty communicate with the Facility staff as soon as possible upon returning to the area.

f. After the electronic credentials file has been reopened for credentialing, the Practitioner must update all required information including the licensure information, health status, and professional activities while on active duty.

g. The credentials file must be brought to a verified status. If the Practitioner performed clinical work while on active duty, an attempt is made to confirm the type of duties, the Practitioner's physical and mental ability to perform these duties, and the quality of the work. This information must be documented.

h. The verified credentials, the Practitioner's request for returning the privileges to an Active Status, and the Service Chief's recommendation are presented to the CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) for review and recommendation. The documents reviewed, the determination, and the rationale for the determination of the Executive Committee of the Medical Staff is documented and forwarded to the Director for recommendation and approval of restoring the Practitioner's privileges to Current and Active Status from Deployment and/or Activation Status. The service chief and CEB Credentials Committee should consider if a routine FPPE should be implemented to monitor the provider's practice depending upon the length of time away from the facility.

i. In those instances when the Practitioner's privileges did not expire during deployment, the expiration date of the original clinical privileges at the time of deployment continues to be the date of expiration of the restored clinical privileges.

j. In those instances where the privileges lapsed during the call to active duty, the Practitioner needs to provide additional references for verification and Facility staff need to perform all verifications required for reappointment.

k. In those instances where the Practitioner was not providing clinical care while on active duty, the Practitioner in cooperation with the Service Chief, must consider whether a request for modification of the privileges held prior to the call to active duty should be initiated on a short-term basis.

### Section 8.07 Medical Assessment

A medical history and physical examination is completed in accordance with time frames noted in VHA Policy, State laws, and regulations. The practitioner must complete and document an updated examination of the patient in accordance with time frames noted in VHA Policy, State laws, and regulations after admission or registration, but prior to surgery or a procedure requiring anesthesia services. The initial and the updated examination of the patient, including any changes in the patient's condition, must be completed and documented by a physician, a surgeon, or other qualified licensed individual in accordance with state law, VHA and hospital policy. The content of complete and focused history and physical examination is delineated in Section 3: Responsibility for Care, of the Medical Staff Rules and Regulations.

ARTICLE IX INVESTIGATION, SUMMARY AND PRIVILEGING ACTIONS *

### Section 9.01

*NOTE: Article IX addresses the process to be used when the potential for a clinical care concern has been identified for providers who have been granted clinical privileges. This section does not apply to individuals who are on Scopes of Practice. Those individuals will be managed through a similar process with Human Resources Services. This article defines the steps to be used to gather information of the concern, the employee's clinical job duties and subsequent action to be taken when appropriate.*

1. Concerns Identified: Whenever there are concerns that a Practitioner has demonstrated substandard care, professional (clinical) misconduct, or professional (clinical) incompetence, further information will be gathered to either confirm or refute the legitimacy of the concerns. The individual's immediate supervisor will typically be the individual responsible for conducting a preliminary review of the alleged clinical deficiencies to determine whether a comprehensive focused clinical care review or other administrative review is warranted. The Chief of the Practitioner's clinical service, the Chair of CEB, the Chief of Staff or the Medical Center Director may also initiate a preliminary fact-finding.

2. Documentation: Whenever a preliminary fact finding confirms a concern considered to be detrimental to patient care, to pose a threat to patient safety, to be lower than the standards of the Medical Staff, or to represent Professional Misconduct, Behavior or Behaviors that Undermine a Culture of Safety, or Inappropriate Behavior, as defined in these Bylaws, further review of the concerns may result in a fact-finding, administrative investigation, or comprehensive focused clinical care review. These findings may result in an administrative action.

   a. Material that is obtained as part of a protected performance improvement activity (i.e., 38 U.S.C. 5705) may not be used to support an administrative action although performance improvement data, such as that obtained as a result of an Ongoing Professional Practice Evaluation (OPPE), may trigger a more comprehensive review of the Practitioner's work.

   b. Quality improvement information is confidential and privileged in accordance with 38 U.S.C. 5705. Therefore, if such information is necessary in order to conduct a review of the alleged professional deficiencies and any action resulting from the review, it must be developed through mechanisms independent of the performance improvement program, such as a fact-finding, a comprehensive focused clinical care review, an administrative investigation, etc.

3. Summary Suspension of Privileges: The Director has the authority, whenever immediate action must be taken in the best interest of patient care due to the potential of imminent danger to the health and well-being of an individual, including the Practitioner, to summarily suspend all or a portion of a Practitioner's delineated clinical privileges. Such suspension shall become effective immediately upon imposition by the Medical Center Director. The typical process to be followed in order to summarily suspend a Practitioner's privileges is as follows (for information about the Automatic Suspension of Privileges, see paragraph 6 below):

   a. The Chief of Staff will make a recommendation to the Medical Center Director that a summary suspension of all or part of the Practitioner's privileges be invoked because the failure to take such action may result in an imminent danger to the safety and welfare of an individual.

   b. The Medical Center Director will approve the request, if appropriate, and the Practitioner will be issued a notification letter that all or part of the Practitioner's clinical privileges are suspended and include the general reason that the action being taken. For physicians and dentists, this notice will also include information in regard to the requirement to report the individual to the National Practitioner Data Bank (NPDB) if the Practitioner should retire or resign prior to the conclusion of the clinical review and any action resulting from those findings being imposed. (*NOTE:* Management's decision to take a Practitioner out of patient care or place a Practitioner in an authorized leave status due to patient care concerns will result in a summary suspension of clinical privileges being imposed as the underlying reason for such action is due to concerns about the imminent danger to the health or well-being of an individual, and a summary suspension of clinical privileges letter must be issued to the Practitioner immediately.) The letter

31

also notifies any Practitioner who is summarily suspended that information gathered during the review may be used in reporting to their respective State Licensing Board(s).

c.  Immediately upon the imposition of a summary suspension, the Service Chief or the Chief of Staff will ensure that alternate medical coverage for the Practitioner's patients is provided.

d.  The written notification of summary suspension of clinical privileges may afford the Practitioner of the opportunity to submit, within14 calendar days from receipt of the summary suspension notification letter, a written response to the concerns identified within the letter.

e.  If the Practitioner provides a written response, the Medical Center Director will determine whether or not the summary suspension of privileges should continue to be imposed pending the outcome of the comprehensive clinical review and any further action imposed as a result of the review. If the decision is made to continue the summary suspension of privileges, the Practitioner's response to the identified issues will be shared with the individual(s) conducting the review of the clinical concerns.

4.  Administrative Denial of Privileges Pending the Outcome of an Investigation

a.  If a Practitioner's privileges are due to expire during a Summary Suspension, they must still be asked to submit information required for re-credentialing and request all privileges that were held prior to the Summary Suspension. Failure to request all privileges previously held will be considered a voluntary relinquishment of privileges during an investigation and may be reportable to the NPDB if the Practitioner is a physician or dentist.

b.  The service chief and CEB Credentials Committee to Executive Committee of the Medical Staff (CEB) may recommend an Administrative Denial of Privileges Pending the Outcome of an Investigation rather than recommending the granting or denial of privileges before all relevant information to make such a determination is available.

c.  The Practitioner will be notified in writing of the decision to administratively deny the privileges pending outcome of the investigation. The notification will also inform the provider that they remain under investigation and that this action is not reportable to NPDB as it is an administrative action and not "for cause".

d.  The Practitioner's privileges will lapse on the expiration date (cannot be extended for any reason) and the Practitioner will not hold privileges at this facility until the investigation has concluded and there is a decision based upon the outcome as to whether the requested privileges will be granted or denied.

e.  An administrative denial of privileges may be taken on one or more privileges depending upon the circumstances. If the summary suspension was not for all privileges, the recommendation may be to grant select privileges and administratively deny those that are under investigation.

f.  If the requested privileges are subsequently denied after the Investigation has concluded, subsequent appointment and Human Resource actions will be considered accordingly.

5.  Review Process:

a.  When sufficient evidence exists, based on the preliminary fact finding, that a Practitioner may have demonstrated substandard care, professional misconduct or professional incompetence that impacts the Practitioner's ability to deliver safe, high quality patient care, the Chief of Staff will normally appoint one or more impartial clinical care reviewers to complete a comprehensive focused -clinical care review of the concerns(s) or issues(s). The clinical care reviewers may be from other VHA healthcare facilities as required for involvement of a peer of same specialty with similar privileges and to ensure objectivity in the review.

b.  The Chief of Staff will determine the appropriate methodology and membership for conducting a review. The individual(s) tasked with performing this review must conduct it in a fair and objective manner, and may be selected from the Practitioner's facility or another facility at the discretion of the Chief of Staff and/or Medical Center Director.

c.  If the Practitioner (applies only Physicians/Dentists) is not summarily suspended as indicated in paragraph 3 of this Part, the Practitioner will be issued a letter informing the Practitioner that he/she is under Investigation and notifies the Practitioner that if he/she resigns or retires while

32

the review is being conducted, the Practitioner may be reported to the National Practitioner Data Bank (NPDB).

d.   The individual(s) who are conducting the comprehensive focused clinical care review have the discretion to meet with the Practitioner to discuss or explain the clinical care concerns.  This meeting does not constitute a Hearing and none of the procedural rules set forth in Article X of these Bylaws apply thereto.  An investigation initiated at the direction of the Chief of Staff is an administrative matter and not an adversarial Hearing.  A record of such meeting is made and included with the reviewers' findings, conclusions and recommendations reported to the CEB Credentials Committee.

e.   The comprehensive focused-clinical care review is typically completed within 30-calendar days but may be extended if circumstances warrant a longer review period.  Documentation in support of an extension should be maintained, and the Practitioner should be notified on regular intervals of the status of the review and the Practitioner being investigated will be apprised of the extension.

f.   The reviewer(s) may review any documentation needed to fully assess the issues (except for those exempt in paragraph 2 above) and/or interview witnesses, including the Practitioner, at their discretion. The reviewer(s) should be asked if the provider met the standard of care (yes or no) and if not, why the standard was not met.

g.   The report of the comprehensive focused clinical care review will be made to the CEB Credentials Committee within 14 days after the reviewers have completed the investigation.  The CEB Credentials Committee will assess the results and make a recommendation to the Medical Center Director regarding the appropriate action to be taken.  The CEB Credentials Committee has the discretion to meet with the Practitioner within 10 calendar days after receipt of the evidence to ask him/her questions about the findings before reaching a conclusion regarding their recommendations.  The CEB Credentials Committee is not required to meet with the Practitioner, and if the Practitioner fails to meet with the CEB Credentials Committee within a reasonable period of time, which is typically 14 days calendar days after the meeting is requested, the CEB Credentials Committee must submit its recommendation for action without the Practitioner's input.  This proceeding does not constitute a hearing, and there is no entitlement to any procedural rules set forth in Article X of these Bylaws or any other VA regulations.  The CEB Credentials Committee is not required to share the report or any supporting documentation in advance of the proceeding or during the proceeding with the Practitioner.  A record of such proceedings will be made and included with the reviewers' findings, conclusions and recommendations that are submitted to the Director.

6.   Recommendations Following the Review:

a.   The CEB Credentials Committee can make the following recommendations to the Director based on the evidence gathered before, during and after the review:

   i.      No action;

   ii.     Initiation of a Focus Peer Performance Evaluation (FPPE) for cause;

   iii.    Revocation of privileges; or

   iv.     Reduction in privileges.

b.   Within five (5) business days, the Medical Center Director will review the recommendation of the CEB Credentials Committee *and* forward it to the Chief of Staff for appropriate administrative action, if applicable.

c.   No action: If the Medical Center Director concurs with the CEB Credentials Committees recommendation for no action, the Practitioner will be notified in writing within five calendar days and, if applicable, be notified that privileges are restored.

d.   FPPE for Cause:

33

     i.     If the recommendation is for an FPPE for Cause to be initiated, privileges will be reinstated upon the creation and issuance of the FPPE for Cause. The FPPE for Cause will provide appropriate notification to the Practitioner of the areas of weakness and develop a plan under which the Practitioner can improve in order to successfully complete the FPPE for Cause and demonstrate the requisite skill and knowledge in those areas of clinical issues identified as a concern. (NOTE: An FPPE for Cause will normally be for a minimum of 60-calendar days. In general, extension of the FPPE for Cause is discouraged.)

     ii.    Upon completion of the FPPE for Cause, results will be reported back to the CEB.

     iii.   FPPE for Cause is an opportunity for the privileged practitioner to demonstrate competency and improved performance. It is not an adverse action, is not considered an investigation, and is not reportable as an adverse action to the National Practitioners Data Bank. If the Practitioner is unable to demonstrate competency and improved performance, the FPPE for Cause may be stopped at any point by the supervisor to ensure patient safety and an adverse privileging action may result.

e.   Revocation of Privileges:

     i.     If the CEB Credentials Committee recommends that the Practitioner's privileges be revoked, or if a Practitioner fails an FPPE and the CEB Credentials Committee subsequently recommends the revocation of privileges, the Chief of Staff will assess the evidence and coordinate the separation of the Practitioner with Human Resources Management Service, unless management offers the practitioner a position at the facility that does not require the Practitioner to have clinical privileges.

     ii.    If the Practitioner is appointed as a full-time permanent employee under the provisions of 38 U.S.C. 7401(1), the Chief of Staff will issue a proposed removal and proposed revocation of privileges in accordance with VA Handbook 5021, Part II, unless other separation procedures under VA Handbook 5021, Part VI are applicable. If the Practitioner is separated and the Practitioner's privileges are revoked for issues involving professional conduct or competence, the Practitioner will be afforded the opportunity to file a proper appeal to a Disciplinary Appeals Board, if applicable.

     iii.   If the Practitioner is appointed under the provisions of 38 U.S.C 7405(a)(1), the Medical Center Director will issue a discharge notice in accordance with VA Handbook 5021, Part VI, unless other separation procedures under VA Handbook 5021 are applicable. The Practitioner will subsequently be notified of the right to a fair hearing after the separation is imposed in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

     iv.   If the Practitioner is a full-time employee serving a probationary period under 38 U.S.C. 7403, the procedures in VA Handbook 5021, Part III will be followed unless other separation procedures under VA Handbook 5021, Part VI are applicable. If the Practitioner is separated following these procedures, the Practitioner will be afforded the opportunity for a fair hearing after the separation is imposed in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

     v.    If the Practitioner is appointed through a contract, the contracting officer will be notified of the recommendation for revocation of clinical and privileges and need to remove the Practitioner from the facility. The Practitioner will be separated and subsequently be notified of the right to a fair hearing after separation in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s)

34

for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reappointment to the medical center

f.   Reduction of Privileges:

i.   If the CEB Credentials Committee recommends that the Practitioner's privileges be reduced, or if a Practitioner fails an FPPE for Cause and the CEB Credentials Committee subsequently recommends the reduction of privileges, the Chief of Staff will assess the evidence and coordinate the reduction of the Practitioner's privileges with Human Resources Management Service.

ii.   If the Practitioner is appointed as a full-time permanent employee under the provisions of 38 U.S.C. 7401(1), the Chief of Staff will issue a proposed reduction of privileges and proposed reduction in grade or basic pay in accordance with VA Handbook 5021, Part II, if the Practitioner's change in privileges will result in a reduction in grade or basic pay. If the Practitioner's grade or basic pay and privileges are reduced for issues involving professional conduct or competence, the Practitioner will be afforded the opportunity to file a proper appeal to a Disciplinary Appeals Board.

iii.   If the Practitioner is appointed under the provisions of 38 U.S.C 7405(a)(1), the Medical Center Director must determine if the Practitioner's services are still needed given the reduction in privileges.

   a.   If it is determined that the Practitioner's services are still needed, management will follow the procedures for modifying a Practitioner's privileges.

   b.   If the Practitioner's services are no longer needed then the Practitioner will be issued a discharge notice in accordance with VA Handbook 5021, Part VI, unless other separation procedures under VA Handbook 5021 are applicable. The Practitioner will subsequently be notified of right to a fair hearing after separation in accordance with Article X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

iv.   If the Practitioner is a full-time employee serving a probationary period under 38 U.S.C. 7403, the Practitioner may be assigned to duties that do not require a reduction in privileges or the procedures in VA Handbook 5021, Part III will be followed, unless other separation procedures under VA Handbook 5021, Part VI are applicable. (NOTE: Probationary employees cannot be issued a major adverse action, and thus a suspension, transfer of function, reduction in grade or basic pay is not an option.) If the Practitioner is separated, he/she will be afforded the opportunity for a fair hearing after separation in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. The hearing will not serve as an appeal to be reemployed by the agency.

v.   If the Practitioner is appointed through a contract, the contracting officer will be notified of the recommendation for reduction of clinical and privileges. If the Practitioner's services are no longer needed, the Practitioner will be separated from the contract and subsequently be notified of the right to a fair hearing after separation in accordance with Part X of these Bylaws. The fair hearing is limited to a determination as to whether or not the reason(s) for the separation from the contract is for substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB. If it is determined that the Practitioner's services are still needed, management will notify the Practitioner of the right to a fair hearing of the reduction of clinical privileges in accordance with Part X of the Bylaws. The fair hearing is limited to a determination as to

35

whether or not the reason(s) for the reduction are due to substandard care, professional misconduct, or professional incompetence, which would result in reporting to the NPDB.

7.  Automatic Suspension of Privileges:

   a.  An automatic suspension of privileges occurs immediately under the occurrence of an event that may include, but is not limited to, the following:

      i.   The Practitioner is being investigated or was indicted for a misdemeanor or felony. The privileges may only be reinstated after the outcome of the legal issue is finalized and after a determination is made regarding the nexus between the legal issue and the mission of VA.

      ii.  The Practitioner is being investigated for conduct or behavior issues that do not have an impact on patient care but management has determined it could negatively impact the work environment.

      iii. The Practitioner is being investigated for the fraudulent use of Government equipment or a Government-issued credit card.

      iv.  The Practitioner fails to maintain the mandatory requirements for membership to the medical staff.

      v.   The Practitioner being on leave for an extended period of time such as chronic illness.

   b.  Immediately upon the imposition of an automatic suspension, the Service Chief or the Chief of Staff will ensure that alternate medical coverage for the Practitioner's patients is provided.

   c.  The Medical Center Director may initiate an appropriate review of the concern(s) or issues(s) resulting in the automatic suspension to include recommendations for appropriate administrative action.

   d.  If there are more than three automatic suspensions of privileges in 1 calendar year, or more than 20 days of automatic suspension in 1 calendar year, a thorough assessment of the need for the Practitioner's services must be performed, documented in writing, and appropriate action taken.

8.  Actions Not Constituting Corrective Action:  The comprehensive clinical care reviewers responsible for conducting reviews are not deemed to have proposed an adverse recommendation or action, or to have made such a recommendation, or to have taken such an action, and the right to a hearing under Article X or a Disciplinary Appeals Board (DAB) will not have arisen in any of the following circumstances:

   a.  The appointment of an ad hoc committee investigation committee;

   b.  The conduct of an investigation into a matter;

   c.  The making of a request or issuance of a directive to an applicant or a Practitioner to appear at an interview, conference, or proceeding before the CEB Credentials Committee, any ad hoc investigating committee, the Chief of Staff, or any other committee or sub-committee with appropriate jurisdiction in connection with any investigation conducted prior to a proposed adverse recommendation or action;

   d.  The failure to obtain or maintain any mandatory requirement for Medical Staff membership;

   e.  The imposition of proctoring or observation on a Medical Staff member, which does not restrict clinical privileges or the delivery of professional services to patients;

   f.  Corrective counseling;

36

g. A recommendation that the Practitioner be directed to obtain retraining, additional training, continued education, or placement on an FPPE; or

h. Any recommendation or action not "adversely affecting" (as such term is defined in Section 431(1) of the Health Care Quality Improvement Act) any applicant or Practitioner, or which is not based on a subjective determination of the professional competency or conduct of the applicant or Practitioner.

## ARTICLE X FAIR HEARING AND APPELLATE REVIEW *

### Section 10.01 Reduction of Privileges

1. Reduction of Privileges:   Reference VHA Credentialing and Privileging Handbook 1100.19

   a. Prior to any action or decision by the Director regarding reduction of privileges, the Practitioner will receive written notice of the proposed changes in privileges from the Chief of Staff. The notice will include:
      (1) A description of the reason(s) for the change.
      (2) A statement of the Practitioner's right to be represented by counsel or a representative of the individual's choice, throughout the proceedings.

   b. The Practitioner will be allowed to review all evidence not restricted by regulation or statute upon which proposed changes are based. Following that review, the Practitioner may respond in writing to the Chief of Staff's written notice of intent. The Practitioner must submit a response within I0 workdays of the Chief of Staff's written notice. If requested by the Practitioner, the Chief of Staff may grant an extension for a brief period, normally not to exceed I0 additional workdays except in extraordinary circumstances.

   c. Information will be forwarded to the Director for decision. The Director will make a decision on the basis of the record. If the Practitioner disagrees with the Director's decision, a hearing may be requested. The Practitioner must submit the request for a hearing within five (5) workdays after receipt of decision of the Director.

   d. A proposed action taken to reduce a Practitioners privileges will be made in accordance with VHA Handbook 1100.19. In instances where reduction of privileges is proposed for permanent Title 38 employees appointed under Section 7401(1) of Title 38 United States Code, the proposed reduction of privileges will be combined with a major adverse action (e.g. suspension, reduction in basic pay, reduction in grade, transfer, etc.) in accordance with Section 7451 7454 of Title 38, United States Code and VA Handbook 5021 Employee/Management Relations. *Note:* A major adverse action may not be proposed against a 38 U.S.C. Section 7403 or Section 7405 (except nurses) employee, or a contractor.

2. Convening a Panel:

   a. A panel is not convened if a reduction in clinical privileges is combined with a major adverse action, such as a suspension, reduction in grade, or a reduction in basic pay, due to substandard care, professional misconduct or professional incompetence. A reduction in basic pay may occur when a physician's salary is reduced by a pay panel as a result in a reduction in privileges. In those instances, the proposed reduction and proposed major adverse action are taken together in accordance with the provisions of VA Handbook 5021, Part II.

   b. In the case of a reduction in clinical privileges that does not constitute a major adverse action or is not combined with a major adverse action in accordance with VA Handbook 5021, the facility Director must appoint a review panel of at least three unbiased professionals, within 5 business days after receipt of the Practitioner's request for a hearing. These professionals will conduct a review and hearing. At least two members of the panel must be members of the same profession. If specialized knowledge is required, at least one member of the panel must be a

37

member of the same specialty. This review panel hearing is the only hearing process conducted in connection with the reduction of privileges. Any other review processes must be conducted on the basis of the record. The hearing will proceed as follows:

   i)  The Practitioner must be notified in writing of the date, time, and place of the hearing. The date of the hearing must not be less than 20 business days and not more than 30 business days from the date of notification letter.
   ii) During such hearing, the Practitioner has the right to:
       (a) Be present throughout the evidentiary proceedings.
       (b) Be represented by an attorney or other representative of the Practitioner's choice. **NOTE:** If the Practitioner is represented, this individual is allowed to act on behalf of the Practitioner including questioning and cross-examination of witnesses.
       (c) Cross-examine witnesses.

   **NOTE:** The Practitioner has the right to purchase a copy of the transcript or tape of the hearing.

3. The panel must complete the review and submit the report within 15 business days from the date of the close of the hearing. The panel may request in writing that the facility Director grant additional time for extraordinary circumstances or cause.

   a. The panel's report, including findings and recommendations, must be forwarded to the facility Director, who has authority to accept, reject, accept in part, or modify the review panel's recommendations.

   b. The facility Director must issue a written decision within 10 business days of the date of receipt of the panel's report. If the Practitioner's privileges are reduced, the written decision must indicate the reason(s). The signature of the facility Director constitutes a final action and the reduction is reportable to the NPDB.

   c. If the Practitioner wishes to appeal the Director's decision, the Practitioner may appeal to the appropriate VISN Director within 5 business days of receipt of the facility Director's decision. This appeal option will not delay the submission of the NPDB report. If the Director's decision is overturned on appeal, the report to the NPDB must be withdrawn.

   d. The VISN Director must provide a written decision, based on the record, within 20 business days after receipt of the Practitioner's appeal.

   **NOTE:** The decision of the VISN Director is not subject to further appeal.

4. The hearing panel chair shall do the following:

   a. Act to ensure that all participants in the hearing have reasonable opportunity to be heard and to present oral and documentary evidence subject to reasonable limits on the number of witnesses and duration of direct and cross examination, applicable to both sides, as may be necessary to avoid cumulative or irrelevant testimony or to prevent abuse of the hearing process.

   b. Prohibit conduct or presentation of evidence that is cumulative, excessive, irrelevant, or abusive, or that causes undue delay. In general, it is expected that a hearing will last no longer than a total of 15 hours.

   c. Maintain decorum throughout the hearing.

   d. Have the authority and discretion to make rulings on all questions that pertain to matters of procedure and to the admissibility of evidence.

38

e. Act in such a way that all information reasonably relevant to the continued appointment or clinical privileges of the individual requesting the hearing is considered by the hearing panel when formulating its recommendations.

f. Conduct argument by counsel on procedural points and do so outside the presence of the hearing panel.

g. Seek legal counsel when he or she feels it is appropriate. Regional Counsel to the facility should advise the panel chair.

5. Practitioner Rights:

a. The Practitioner has the right to be present throughout the evidentiary proceedings, represented by counsel or a representative of Practitioner's choice, (provided that this representative does not have a conflict of interest) cross-examine witnesses, and to purchase a copy of the transcript or tape of the hearing.

b. The Practitioner may submit a written appeal to the VISN Director within 5 business days of receipt of the Director's decision, if he/she is in disagreement with the decision rendered.

c. If a Practitioner surrenders or voluntarily accepts a restriction of his/her clinical privileges, or resigns or retires from his/her medical staff position with the Department of Veterans Affairs while the Practitioner's professional competence or professional conduct is under investigation to avoid investigation, for greater than 30 days such action is reported without further review or due process to the NPDB and the appropriate state licensing boards.

## Section 10.02 Revocation of Privileges

6. Revocation of Privileges:

a. Proposed action taken to revoke a Practitioner's privileges will be made in accordance with VHA Handbook 1100.19, and the following regulations are applicable:

   i) In instances where revocation of privileges is proposed for permanent Title 38 employees appointed under Section 7401(1) of Title 38 United States Code, the proposed revocation will be combined with action to discharge the employee under Section 7461-7464 of Title 38, United States Code and VA Handbook 5021 Employee/Management Relation.

   ii) For probationary employees appointed under 38 U.S.C. 7401(1) and part-time temporary registered nurses appointed under 38 U.S.C. 7405; the CEB Credentials Committee will convene in accordance with the procedures outlined in VA Handbook 5021, Employee/Management Relations. If separation is recommended and the recommendation from the CEB Credentials Committee is based in whole, or in part, for reasons of substandard care, professional incompetence, or professional misconduct, the Director, or designee, may separate the Practitioner as prescribed in VA Handbook 5021. Separation constitutes an automatic revocation of clinical privileges, which is reportable to the NPDB, if the Practitioner is a physician or dentist, but only after being afforded due process. All practitioners, whether reportable to the NPDB or not, are entitled to due process. Refer to Article X, Section 10.01, para 2 for due process procedures.

   iii) In instances where the Practitioner is appointed through a contract or other "at will" appointment, including but not limited to part-time (excluding part-time temporary registered nurses who are covered under the procedures in para 5(a)(ii), fee basis, without compensation, or intermittent appointment, separation may occur immediately, but separation constitutes an automatic revocation of clinical privileges and is reportable to the NPDB if the Practitioner is a physician or dentist, and the revocation is for substandard care, professional incompetence, or professional misconduct. A report to the NPDB may not be filed until the Practitioner has been afforded a limited fair hearing to determine if the resulting revocation of

privileges was due to substandard care, professional misconduct, or professional incompetence. The contractor has no other right to appeal.

b. Revocation procedures will be conducted in a timely fashion. Revocation of clinical privileges may not occur unless the Practitioner is also discharged, separated during probation, or the appointment is terminated. However, in extremely rare cases, there may be a credible reason to reassign the Practitioner to a position not requiring clinical privileges. Such an action may still result in reporting to the NPDB if the Practitioner is a physician or dentist and the revocation of privileges and subsequent reassignment constitutes a major adverse action due to a reduction in grade or basic pay, is for reasons of substandard care, professional incompetence, or professional misconduct (e.g., a surgeon's privileges for surgery may be revoked, and the surgeon may be reassigned to a non-surgical area when doing so is beneficial to meeting other needs of the facility). Any recommendation by the Executive Committee of the Medical Staff for the reduction, suspension, or revocation of clinical privileges, or for the suspension or revocation of Medical Staff membership, entitles the Practitioner to the rights set forth in Article X, section 10.01, para 2 of these Bylaws.

7.    Reporting to the National Practitioner Data Bank[1]:

a. Tort ("malpractice") claims are filed against the United States government, not individual Practitioners. There is no direct financial liability for named or involved Practitioners. Government attorneys (Regional Counsel, General Counsel,) considers the allegations, and deny, settle, or defend the case. Claims that are denied may subsequently go to litigation.

b. When a claim is settled or a judgment is made against the Government (and a payment made), a VA review is conducted to determine if the involved Practitioners should be reported to the NPDB. The review must determine that there was substandard care, professional incompetence, or professional misconduct and if so, is attributable to a licensed Practitioner in order to meet reporting requirements.

c. Practitioners are also identified and notified at the time a tort claim is filed so that they may assist regional and general counsel in defending the case and in decisions concerning denial or settlement.

d. Post payment reviews are performed nationally by the office of Medical-Legal Affairs. Accordingly, a letter is now sent to physicians involved in the plaintiff's case when a tort claim settlement is submitted for review.

e. VA only reports adverse privileging actions that adversely affect the clinical privileges of Physician and Dentists after a professional review action or if the Practitioner surrenders clinical privileges while under investigation. The professional review action is the due process (e.g. fair hearing and appeal process) afforded the Practitioner for a reduction or revocation of clinical privileges. The reference for this is 38 CFR part 46.4 The notice of summary suspension to the Practitioner must include a notice that if a final action is taken, based on professional competence or professional conduct, both the summary suspension, if greater than 30 days, and the final action will be reported to the NPDB. After the final action, the reduction or revocation as well as the summary suspension if greater than 30 days will be reported.

8.    Reporting to State Licensing Boards: VA has a responsibility to report to state licensing boards appointed or suspended members of the Medical Staff whose behavior or clinical practice so substantially fails or failed to meet generally accepted standards of clinical practice as to raise reasonable concern for the safety of patients.

9.    Management Authority: Nothing in these procedures restricts the authority of management to detail or reassign, on a temporary basis, an employee to non-patient care areas or activities, thus suspending privileges, during the pendency of any proposed reduction of privileges or discharge, separation, or termination proceedings. Further, the Director, on the recommendation of the Chief of

---

[1] Reference VHA Handbook 1100.17.

Staff, may summarily suspend privileges, on a temporary basis, when there is sufficient concern regarding patient safety or specific practice patterns. Individuals appointed under authority of 38 U.S.C.7401(1) and 7405 may be terminated when this is determined to be in the best interest of VA in accordance with provisions of VHA Handbook 5021 Employee/Management Relations.

## ARTICLE XI RULES AND REGULATIONS *

1. As may be necessary to implement more specifically the general principles of conduct found in these Bylaws and to identify the level of clinical practice that is required of each member of the Medical Staff and of all others with delineated clinical privileges or practicing under a Scope of Practice, Medical Staff Rules and Regulations may be adopted. Rules and Regulations may be adopted, amended, repealed or added by a majority vote of the members (as determined by the Facility) of the Medical Staff present and voting at any meeting of that Committee where a quorum exists, provided that written recommendations concerning the proposed amendments were received and reviewed by the members of the Committee prior to the meeting. Medical Staff Rules and Regulations must be approved by the Director.

## ARTICLE XII AMENDMENTS *

1. The Bylaws are reviewed at least every two years, revised as necessary to reflect current practices with respect to Medical Staff organization and functions, and dated to indicate the date of last review. Proposed amendments to the Bylaws may be submitted in writing to the Chief of Staff by any member of the Medical Staff. Recommendations for change come directly from Medical Staff Meeting. Changes to the bylaws are amended, adopted and voted on by the Organized Medical Staff as a whole and then approved by the Director. The Bylaws are amended and adopted by 51% endorsement of the active medical staff.

2. The Executive Committee may provisionally adopt and the Director may provisionally approve urgent amendments to the Rules and Regulations that are deemed and documented as such, necessary for legal or regulatory compliance without prior notification to the medical staff. After adoption, these urgent amendments to the Rules and Regulations will be immediately communicated back to the Organized Medical Staff for retrospective review and comment on the provisional amendment. If there is no conflict, the adoption of the urgent amendment will stand approved. Should a conflict arise, the Conflict Management process noted in Article III, Section 3.04 should be followed.

3. Written text, delivered via e-mail or notice of posting to local VA home page, of proposed significant changes is to be provided to Medical Staff members and others with clinical privileges. Medical Staff members will be given time to review proposed changes and are notified of the date proposed changes are to be considered.

4. All changes to the Bylaws require action by both the Organized Medical Staff and Facility Director. Neither may unilaterally amend the Bylaws.

5. Changes are effective when approved by the Director.

## ARTICLE XIII ADOPTION *

These Bylaws shall be adopted upon recommendation of the Organized Medical Staff at any regular or special meeting of the Organized Medical Staff at which a quorum is present. They shall replace any previous Bylaws and shall become effective when approved by the Director.

If the voting members of the organized medical staff propose to adopt a rule, regulation, or policy or an amendment thereto, they must first communicate the proposal to the Executive Committee. If the Executive Committee proposes to adopt a rule, regulation or policy or an amendment thereto, they must first communicate the proposal to the medical staff. When the Executive Committee adopts a policy or amendment thereto, it must communicate this to the medical staff.

RECOMMEND

# GRANT
# GILROY

Digitally signed by
GRANT GILROY
Date: 2023.03.07
16:00:13 -05'00'

Grant Gilroy, MD                                    Date
Acting Chief of Staff


APPROVED

Digitally signed by Jon E
Jon E Beidelschies Beidelschies 100521
100521
Date: 2023.03.08
07:59:04 -06'00'

Jon Beidelschies, J.D.                              Date
Acting Director

42

## MEDICAL STAFF RULES

### 1. GENERAL

a. The Rules relate to role and/or responsibility of members of the Medical Staff and individuals with clinical privileges in the care of any and all patients.

b. Rules of Departments or Services will not conflict with each other, rules and policies of the Medical Staff, or with requirements of the Governing Body.

c. The Medical Staff as a whole shall hold meetings at least annually.

d. The Clinical Executive Board serves as the executive committee of the Medical Staff and between the annual meetings, acts in their behalf. The Committee is responsible for continually reviewing the quality of the clinical care carried out in the facility.

e. Each of the clinical Services shall conduct meetings at least quarterly to consider findings from ongoing monitoring and evaluation of the quality and appropriateness of patient care and treatment. Minutes must reflect discussion by medical staff and responsible party of patient care issues, with resultant significant conclusions, recommendations, action taken, and evaluation of follow-up actions.

f. Information used in quality improvement as referenced in Article IX, cannot be used when making adverse privileging decisions.

g. All Medical Staff members shall participate in chart reviews for Focused and Ongoing Professional Practice Evaluations (F/O PPE) as requested/assigned for both VA Illiana Health Care System (VAIHCS) employees and those sites located within VISN 12.

### 2. PATIENT RIGHTS *

a. Patient's Rights and Responsibilities: This Organization supports the rights of each patient and publishes policy and procedures to address rights including VA Illiana Health Care System Medical Center Memorandums outlining:

   i) Patient Rights, Grievances, Responsibilities and Conduct (MCM 12-12)

   ii) Informed Consent (MCM 11-34)

   iii) Advance Directives (Withholding, Withdrawal Life Sustaining Treatment) (MCM 11-55)

   iv) Patient CPR Status and Treatment Preferences (MCM 11-51)

### 3. RESPONSIBILITY FOR CARE*

a. Conduct of Care

   i) Management of the patient's general medical condition is the responsibility of a qualified member of the Medical Staff.

      (1) The attending Staff Physician is responsible for the preparation and completion of a complete medical record for each patient. This record shall include a medical examination, an updated problem list, identification data, chief complaints, personal history, family history, history of present illness, physical examination, special reports such as consultations, clinical laboratory, x-ray and others, provisional diagnosis, medical and/or surgical treatment, operative report with pre/post-operative progress notes, pathological findings, progress notes, doctor's discharge instructions sheet, including condition on discharge (discharge note) and final diagnosis, and final summary.

      (2) A complete inpatient admission H&P examination will be available in accordance with time frames noted in VHA Policy, State laws, and regulations of admission. In a Community Living Center (CLC), an H&P will be available in accordance with time frames noted in VHA Policy, State laws, and regulations of admission, including any co-signature

43

that may be required. For all PRRTP (Psychosocial Residential Rehabilitation Treatment Program) admissions, the H&P will be available within 7 days. For specialty programs such as HBPC (Home Based Primary Care) and MHICM (Mental Health Intensive Care Management), specific guidelines will be followed. All H&P's completed by a resident, or Advanced Practice Professionals will be co-signed in accordance with time frames noted in VHA Policy, State laws, and regulations of entry in the medical record. If a delay in placement on the chart is expected (i.e., admission on weekend or holiday when no transcription staff are available), the provider will assure compliance with time standards by typing the H&P directly into CPRS. The H&P will be documented electronically under the Physicians/History and Physical title. The H&P will contain (MCM 11-29, The Medical Record):

- Chief complaint of patient
- History of present illness
- Past medical history (The history will contain the required information for the patient who is a former POW, claims exposure to herbicides, military nuclear ionizing radiation, environmental contaminants, claims service connection for post-traumatic stress disorder, and/or indicates that medical care was rendered during active duty status.)
- Social/Family history
- Review of systems/physical exam, including nutritional assessment
- Treatment plan
- Conclusion/Impressions

(3) When the patient is readmitted and/or has surgery in accordance with time frames noted in VHA Policy, State laws, and regulations of performance of a previous H&P exam, an interval H&P exam reflecting any changes may be used, providing the original exam is readily available, and it is professionally determined that such an examination, in conjunction with the prior examination, is adequate to reflect a comprehensive current physical assessment. The interval H&P must comply with time standards for completion.

(4) An interval H&P examination, where used, will be entered electronically under the title Physicians/Interval History and Physical and will contain:

- A statement that the previous H&P examination has been reviewed and is accurate, including the date of the previous H&P; and
- An appropriate assessment was completed confirming the necessity for the procedure or care is still present; and
- A statement that there are pertinent additions to the history and/or subsequent changes in the physical findings, which will be specified, if applicable; OR

(5) A statement indicating there is no change noted in the review of the previous H&P. A patient remaining on inpatient status for a year or longer will be given an annual examination. The comprehensiveness of this examination will be determined by the physician based upon the age, sex, and previous and current health status of the patient. The mental status of psychiatric patients will be reevaluated at the time of the annual examination.

(6) When a patient is first seen on an ambulatory or outpatient care level, a relevant history of the illness or injury, and physical findings must be documented in the medical record. While on ambulatory and/or outpatient care status for a year, on the next visit, the patient must be given an annual physical or, if applicable, an assessment of the condition for which care is authorized.

44

(7) In addition to the H&P, special protocols, as prescribed in current directives, will be followed for certain patients such as former POW's and those who have alleged exposure to:
  (a) Nuclear tests
  (b) Ionizing radiation
  (c) Agent Orange
  (d) Environmental contaminants, or
  (e) Other events, chemicals or substances as delineated by law.

(8) Food and nutrition products are administered only on the prescription or order of a Medical Staff member, an authorized house staff member, or other individual who has been granted authority to write such prescriptions or orders, within their scope of practice.

(9) Progress notes are used for recording pertinent, meaningful observations and information concerning the care of patients. Notes shall be documented, signed, and co-signed where applicable, in a timely manner, and at sufficient intervals to reflect the health care practitioner's ongoing assessment of the patient, as well as whether treatment regimen should continue as previously ordered, or whether changes or additions to care plan are indicated. Each progress note must be legible, coherent, in correct chronological sequence, and dated and authenticated by its author. Progress note entry will follow MCM 11-29, The Medical Record.

(10) Upon determination that a Do Not Resuscitate (DNR) order is appropriate, the order must be written or, at minimum, countersigned by the attending physician in the patient's medical record. There must be documentation of the order and how the decision was reached (e.g., discussed with patient or family), per MCM 11-51 Patient CPR Status and Treatment Preferences at any time a DNR order is written, the patient's rights will be observed. Once the order has been entered, it is the responsibility of the attending physician to ensure that the order and its meaning are discussed with appropriate members of the Facility staff, particularly the nursing staff, so that all involved professionals understand the order and its implications.

(11) Patients will not be transferred out when the Facility has the means to provide adequate care. Patients who are medically stable for transport may be authorized for transfer only after authorization is given by the appropriate provider as defined in MCM 11-108, Managing Patient Flow, Transfers and Diversion.

(12) The attending Staff Physician will provide education to patients and families.

(13) The attending Staff Physician will coordinate the care, treatment, and services with other practitioners and hospital personnel, as relevant to the care, treatment, and services of an individual patient.

ii) Under similar clinical circumstances, the same quality of patient care is provided, by all individuals with delineated clinical privileges, within and across Departments and Services and between all staff members who have clinical privileges.

iii) There is to be a comparable level of quality of surgical and anesthesia care throughout the Facility.

b. Consultations:

45

i) Consultation: Except in an emergency, consultation with a qualified physician is desirable when in the judgment of the patient's physician:

   (1) The patient is not a good risk for operation or treatment,

   (2) The diagnosis is obscure, and/or

   (3) There is doubt as to the best therapeutic measures to be utilized.

ii) Consultant: A consultant must be well qualified to give an opinion in the field in which his opinion is sought. The status of the consultant is determined by the Medical Staff and the Executive Committee of the Medical Staff on the basis of an individual's training, experience, and competence.

iii) Essentials of a Consultation: A satisfactory consultation includes examination of the patient and review of the medical record. A written opinion signed by the consultant must be included in the medical record. When operative procedures are involved, the consultation note, except in an emergency, shall be recorded prior to the operation.

iv) Responsibility for Requesting Consultations: The patient's physician, through the Chiefs of Services, shall make certain that members of the staff do not fail in the matter of providing consultation as needed.

v) Psychiatric Consultations: Psychiatric consultation must be requested for all patients who attempt suicide or take a chemical overdose. If the patient refuses to see the consultant, this fact must be documented by the consultant in the medical record.

c. Discharge Planning: Discharge planning is initiated as early as a determination of need is made.

   i) Discharge planning provides for continuity of care to meet identified needs.

   ii) Discharge planning is documented in the medical record.

   iii) Criteria for discharge are determined by the Multidisciplinary Treatment Team.

   iv) Discharge plans, including patient/caregiver education, medications, treatment, follow-up, and patient agreement are documented in the medical record.

d. Discharge

   i) Patients shall be discharged from the Facility only upon the written order of the physician and the discharge summary will be completed (signed) and available for review in CPRS within timeframes noted in accordance with VHA Policy, State laws, and regulations of discharge from the inpatient setting and within time frames in accordance with VHA Policy, State laws, and regulations for CLC residents. At time of completing the final summary, the responsible member of the Medical Staff shall review the medical record to ensure that documents therein pertain to the patient and contain accurate data. The record shall be completed within time frames noted in accordance with VHA Policy, State laws, and regulations of the discharge of the patient. The physician or dentist shall complete his/her portion of the record within time frames in accordance with VHA Policy, State laws, and regulations including authentication.

   ii) Patients from Ambulatory Surgery/Procedure Unit can be discharged based upon order of Licensed Independent Practitioner familiar with the patient or when the Practitioner is not available, based on relevant medical staff approved criteria. The Practitioner's name is recorded in the patient's medical record.

e. Autopsy

   i) Autopsy services are provided by Pathology and Laboratory Medicine Service. The availability of these services will be made known to the family of each decedent and the Medical Staff will attempt to secure authorization for autopsy examination in all deaths. The autopsy is a significant instrument for continuous monitoring activity as part of the Performance Improvement Program within the Facility.

46

ii) There will be legal authorization by the next of kin for autopsy in all instances prior to the initiation of an autopsy, except as provided in 38 CFR 17-170. Whenever possible, the physician responsible for the care of the patient at the time of death will be designated to request permission from the next of kin to perform an autopsy.

iii) Autopsy examination may be performed for medico-legal reasons in cases of unexpected death upon compliance with 38 CFR 17-170, VHA Policy, State laws, and regulations *(See MCM #113-2, Quality Assurance Survey For Autopsy, which includes the Clinical Categories Targeted for Autopsies)*

iv) Autopsy Rates. Autopsies are encouraged as per VHA policy.

v) Autopsy Criteria. VHA policy encourages autopsies be requested from next-of-kin for all deaths, with the request and response documented in the clinical record. Autopsy performance is tracked for quality management purposes. Those cases meeting criteria as Medical Examiner's cases per policy will be referred to the appropriate County Medical Examiner's Office in accordance with state statutes. *(See MCM #113-2, Quality Assurance Survey for Autopsy, which includes the Clinical Categories Targeted for Autopsies)*

vi) Cases in which death was due to suspected negligence, incompetence, or criminal activity require referral to the Medical Examiner, as do all cases in which death may be due to occupational causes.

f. Standard precautions will be vigorously enforced for preventing transmission of infectious diseases.

## 4. PHYSICIANS' ORDERS *

a. General Requirements

   i) Orders are entered into the electronic medical record (EMR).

   ii) Verbal/telephone orders will be discouraged, but it is recognized that there will be times when they are appropriate. Verbal/telephone orders of authorized practitioners shall be accepted and transcribed by qualified personnel. The receiver of any verbal/telephone order will write down the complete order, then read back and receive confirmation from the practitioner who gave the order before entering into the computer system. Verbal/telephone orders will be entered into the computer by the responsible qualified personnel and flagged as verbal or telephone orders. These Verbal/Telephone orders will require the practitioner's signature. The responsible practitioner will authenticate verbal/telephone orders within 72hours. This policy is outlined in VAIHCS MCM 11-89, Processing of CPRS Order by Allied Health Professionals

b. Medication Orders:

All medications shall be administered by, or under the supervision of, appropriately licensed personnel in accordance with approved policy and procedure established with a Service and in accordance with VAIHCS MCM 119-15 Medication Management.

c. Standardized Order Sets (protocols): Standardized order sets are reviewed periodically by Service Chief and modified as needed. All standardized order sets in the EMR/medical record shall be authenticated by a Medical Staff member and are to be signed for each usage by medical staff. All concerned personnel shall be notified of revisions to standardized order sets by the Service Chief.

d. Investigational Drugs: Investigational Drugs are not currently used at VA Illiana Health Care system.

e. Informed Consent:

   i) Informed consent will be consistent with legal requirements and ethical standards, as described in VAIHCS MCM 11-34, Informed Consent.

47

     ii) Evidence of receipt of Informed consent, documented in the medical record, is necessary before procedures or treatment for which it is required.

f. Submission of Surgical Specimens: The list of procedures which do not require a specimen submission for pathological analysis and the list of specimens that require only a gross diagnosis are made conjointly between the pathology department and the medical staff. The pathology department shall provide this list to the Surgical Case Review Committee annually and also following any revisions. (MCM 112-17)

g. Special Treatment Procedures:

     i) DNR (Do Not Resuscitate) and Withholding/Withdrawal of Life Sustaining Treatment

          (1) A description of the role of the physician, family members and when applicable, other staff in decision.

          (2) Mechanisms for reaching decisions about withholding of resuscitative services, including mechanisms to resolve conflicts in decision making.

          (3) Documentation in the medical record.

          (4) Requirements are described in MCM 11-55, Advance Directives (Withholding, Withdrawal of Life Sustaining Treatment), Medical Staff Bylaws, and these Rules.

     ii) Sedation/Analgesia involves the administration of medications that have a risk for undesirable side effects, either immediately or delayed, and may be utilized only within the guidelines of an established protocol in the center policy related to Sedation/Analgesia and according to approved privileges. Only by those Practitioners with approved and current privileges to do so.

## 5. ROLE OF ATTENDING STAFF *

a. Supervision of Residents and Non-Physicians

     i) Residents are supervised by members of the Medical Staff in carrying out their patient care responsibilities.

     ii) Medical staff members who choose not to participate in the teaching program are not subject to denial or limitation of privileges for this reason alone, except that this may result in loss of faculty appointment.

     iii) Advanced Practice Professionals and certain Allied Health Practitioners are supervised by the Medical Staff and are monitored under a Scope of Practice statement.

b. Documentation of Supervision of Resident Physicians

     i) Sufficient evidence is documented in the medical record to substantiate active participation in, and supervision of, the patient's care by the attending physician as described in Facility Policy Memoranda (MCM 142-16, Supervision of Residents), Medical Staff Bylaws, these Rules, and VHA Handbook 1400.1 Resident Supervision.

     ii) Entries in the medical record made by residents or those non-physicians (e.g., PAs, ARNPs, etc.) that require countersigning by supervisory or attending medical staff members are covered by appropriate Facility policy and include:

          (1) Medical history and physical examination.

          (2) Discharge Summary.

          (3) Operative Reports.

          (4) Medical orders that require co-signature.

             (a) DNR.

             (b) Withdrawing or withholding life sustaining procedures.

(c) Certification of brain death.

(d) Research protocols.

(e) Investigational drug usage, ONLY permitted by named principal investigators or co-investigators previously designated in the study.

(NOTE: Because medical orders in EMR do not allow a second signature (co-signature), the attending must either write the order for (1) through (5) above; or in an urgent/emergency situation, the house staff or non-physician must obtain verbal concurrence from the attending, document in the progress notes the discussion and concurrence, and can write and sign the order. The attending medical staff member must then co-sign the progress note noting the discussion and concurrence within time frames in accordance with VHA Policy, State laws, and regulations.)

iii) Residents are allowed to order laboratory studies, radiology studies, pharmaceuticals, and therapeutic procedures as part of their assigned levels of responsibility. In addition, residents are allowed to certify and re-certify treatment plans as part of their assigned levels of responsibility. These activities are considered part of the normal course of patient care and require no additional documentation on the part of the supervising Practitioner over and above standard setting-specific documentation requirements (VHA Handbook 1400 page 6).

c. Designated administrative staff will be authorized to make administrative entries as approved by the Chief of Staff. These administrative entries can be for the purposes of: (1) creating electronic forms for the inclusion into the computerized patient record system, (2) administratively closing open requests or orders, (3) entering administrative progress notes, (4) entering notes to disposition consultation requests and (5) completing other requirements as requested by the Chief of Staff or his/her designee.

## 6. MEDICAL RECORDS *

a. Completion of medical records is addressed in VAIHCS MCM 11-29, The Patient Health Record. Basic Administrative Requirements:

b. Entries must be electronically entered where possible, which automatically dates, times, authenticates with method to identify author, may include written signatures.

c. It is the responsibility of the medical Practitioner to authenticate and, as appropriate, co-sign or authenticate notes by Advanced Practice Professionals.

d. Final diagnosis and complications are recorded without use of abbreviations and symbols. A list of abbreviations not to use can be found in related Facility policy, and is available in CPRS and VISTA. Those abbreviations are not acceptable for use either handwritten or in the EMR.

e. Completion and filing of reports of diagnostic and therapeutic procedures must be accomplished within time frames noted in accordance with VHA Policy, State laws, and regulations.

f. Release of information is required per policy and standard operating procedures for the Facility.

g. All medical records are confidential and the property of the Facility and shall not be removed from the premises without permission (ROI from the Patient/consultation with the privacy officer as appropriate). Medical records may be removed from the Facility's jurisdiction and safekeeping only in accordance with a court order, subpoena, or statute. In case of readmission of a patient, all previous records on file shall be available for the use of Medical Staff.

h. Access to medical records of all patients shall be afforded to Medical Staff members for bona fide study and research, consistent with preserving patient confidentiality and privacy. Specific confidentiality requirements are found in Title 38 U.S.C. 7332.

i. All Medical Records must contain:

   i) Patient identification (name, address, DOB, next of kin).

49

ii) Medical history including history and details of present illness/injury.

iii) Observations, including results of therapy.

iv) Diagnostic and therapeutic orders.

v) Reports of procedures/operations, tests, their results and related pre/post-operative progress notes.

vi) Progress notes.

vii) Consultation reports.

viii) Diagnostic impressions.

ix) Conclusions at termination of evaluation/treatment.

x) Informed consent before procedures or treatments undertaken and if not obtainable, the reason, as stated in Facility Policy Memorandum "Informed Consent."

j. Inpatient Medical Records: In addition the items listed in section i above, all inpatient records must contain, at a minimum:

   i) A history that includes chief complaint, history of present illnesses, childhood illnesses, adult illnesses, operations, injuries, medications, allergies, social history (including occupation, military history, and habits such as alcohol, tobacco, and drugs), family history, chief complaint, and review of systems.

   ii) A complete physical examination includes (but not limited to) general appearance, review of body systems, nutritional status, ambulation, self-care, mentation, social, review of the results of pertinent studies which includes but not limited to, laboratory, radiology tests, and other applicable findings based on the patient assessed personal history. Key examination medical impressions will be documented in the note. The note must be authenticated by provider at the earliest possible time, but always within time frames in accordance with VHA Policy, State laws, and regulations of being written in CPRS.

   iii) If the H&P was completed prior to the admission or procedure, it must be updated the day of admission. If it is more than time frames in accordance with VHA Policy, State laws, and regulations old, a new one must be completed.

   iv) A complete inpatient admission H&P examination will be available within time frames in accordance with VHA Policy, State laws, and regulations. In a Community Living Center (CLC), the H&P will be available within time frames in accordance with VHA Policy, State laws, and regulations, including any co-signature that may be required. For all PRRTP (Psychosocial Residential Rehabilitation Treatment Program) admissions, the H&P will be available within time frames in accordance with VHA Policy, State laws, and regulations. For specialty programs such as HBPC (Home Based Primary Care) and MHICM (Mental Health Intensive Care Management), specific guidelines will be followed.

   v) A discharge plan (from any inpatient admission or PRRTP), including condition on discharge.

   vi) Have a discharge summary signed (from inpatient or PRRTP) available for review in CPRS within time frames in accordance with VHA Policy, State laws, and regulations of discharge from the inpatient setting and time frames in accordance with VHA Policy, State laws, and regulations for CLC residents.

   vii) Completed within time frames in accordance with VHA Policy, State laws, and regulations days of discharge.

k. Outpatient Medical Records: In addition the items listed in section B above, all outpatient records must contain, at a minimum:

   i) A progress note for each visit.

   ii) Relevant history of illness or injury and physical findings including vital signs.

50

iii) Patient disposition and instruction for follow-up care.

iv) Immunization status, as appropriate.

v) Allergies.

vi) Referrals and communications to other providers.

vii) List of significant past and current diagnoses, conditions, procedures, drug allergies,

viii) Medication reconciliation, problem, and any applicable procedure and operations on the Problem List

l. Surgeries and Other Procedures: All aspects of a surgical patient's care, including ambulatory surgery, pre-operative, operative and post-operative care, must be documented. Surgical interventions, diagnostic procedures, or other invasive procedures must be documented to the degree of specificity needed to support any associated coding data and to provide continuity of care.

m. Preoperative Documentation:

i) In all cases of elective and/or scheduled major surgery and/or diagnostic and therapeutic procedures, and if circumstances permit, in cases of emergency surgery, the supervising or staff Practitioner must evaluate the patient and write a pre-operative (pre-procedural) note describing: the findings of the evaluation, diagnosis(es), treatment plan and/or choice of specific procedure to be performed; discussion with the patient and family of risks, benefits, potential complications; and alternatives to planned surgery and signed consent

ii) Invasive procedures and surgeries involving local and/or moderate sedation require a focused history and physical or Subjective/Objective/Assessment/Plan (SOAP) note addressing pertinent positive/negative information, indications for the procedure, known risks related to the procedure, and a physical exam pertinent to the procedure. A formal consultation to the service for performing the procedure that includes all required content will serve as an H&P if done within time frames in accordance with VHA Policy, State laws, and regulations, but must be updated the day of the procedure.

iii) Except in an emergency, no patient may go to the operating room without a complete history and physical examination recorded in his/her chart plus recorded results of lab work and x-rays.

iv) A surgical operation shall be performed only with documented informed consent of the patient or his/her legal representative except in emergencies at which time the Chief of Staff holds jurisdiction.

n. Immediate Post-Operative Documentation: A post-operative progress note must be written, or directly entered into the patient's health record, by the surgeon immediately following surgery and before the patient is transferred to the next level of care. The immediate post-operative note must include:

i) Pre-operative diagnosis,

ii) Post-operative diagnosis,

iii) Technical procedures used,

iv) Surgeons,

v) Findings,

vi) Specimens removed, and

vii) Complications.

viii) The immediate post-operative note may include other data items, such as: Anesthesia, Drains, Tourniquet Time, or Plan.

51

o. Post-Operative Documentation: An operative report must be completed by the operating surgeon immediately following surgery. Immediately means upon completion of the operation or procedure, before the patient is transferred to the next level of care. The body of the report needs to contain the: indication for the procedure; operative findings; technical procedure used; specimens removed; post-operative diagnosis; names of the supervising Practitioner, primary surgeon, and assistants; and the presence and/or involvement of the supervising Practitioner.

p. Post Anesthesia Care Unit (PACU) Documentation: PACU documentation must include the patient evaluation on admission to, and discharge from, the post-anesthesia care unit, a time-based record of vital signs and level of consciousness (either paper or electronic), all drugs administered and their doses, type and amounts of intravenous fluids administered, including blood and blood products, any unusual events including post-anesthesia or post-procedural complications, and post-anesthesia visits.

q. The health record must document the name of the LIP responsible for the patient's release from the recovery room, or clearly document the discharge criteria used to determine release.

r. For inpatients, there needs to be at least one documented post-anesthesia visit after leaving the post-anesthesia care unit. The note needs to describe the presence or absence of anesthesia-related complications.

s. For outpatients, Ambulatory Surgery personnel (i.e., a nurse) must call the patient after surgery, to assess any complications, including anesthetic complications, as appropriate.

## 7. INFECTION CONTROL *

a. Isolation, standard precautions and reportable cases are outlined in MCM 11-21 Infection Control Program and Plan,

## 8. CONTINUING EDUCATION *

All Medical Staff members shall participate in their own individual programs of continuing medical education (CME) in order to keep themselves informed of pertinent new developments in the diagnostic and therapeutic aspects of patient care, to refresh them in various aspects of their basic education, and to meet requirements for re-licensure. Medical Staff members are responsible to see that their own participation in continuing education programs and conferences both in and outside the Facility are documented and verifiable at the time of reappraisal and re-privileging.

## 9. HEALTH STATUS AND IMPAIRED PROFESSIONAL PROGRAM *

The VHA recognizes its responsibility to assist impaired professionals and collaborate with available programs designed to intervene, monitor, refer to treatment, and advocate for physicians and dentists.

a. Where there is evidence that a Licensed Independent Practitioner's practice is impaired as a consequence of chemical dependence or mental or physical illness, the Chief of Staff's office will be notified. Practitioners are allowed to self-refer to a program for assistance for psychiatric, emotional, or physical problems. Assistance in the self-referral may be obtained from their Service Chief or Chief of Staff.

b. In cases of known or suspected impairment due to mental illness or substance use, the Chief of Staff may request an assessment by the Management of the Impaired Physician, Dentist, Optometrist, Podiatrist, and Licensed Independent Practitioner, see MCM 11-102. In cases of known or suspected impairment due to physical and/or mental illness, the Chief of Staff may request the Director to authorize a Special Physical Examination as authorized VA Handbook 5019, Part II, and applicable hospital policy. The Special Physical Examination will be tailored to the clinical circumstances and may involve a physical examination, imaging studies, neuropsychological testing, or other indicated measures. The fitness for duty examination will be conducted by or under the direction of the Occupational Health Program or outside medical examiner, which will assess the findings and make a recommendation on the Practitioner's fitness

for duty based on such findings. If the determination is unfavorable to the Practitioner, or in cases of uncertainty, the findings will be presented to an ad hoc Physical Standards Board.

c. VA and Facility policies, responsibilities and procedures of the Employee Assistance Program and the VA Drug-Free Workplace Program are applicable for physicians, dentists, and other healthcare professionals.

d. Confidentiality of the Practitioner seeking referral or referred for assistance will be kept, except as limited by law, ethical obligation, or when the safety of a patient is threatened. In all instances, every effort will be made to protect the confidentiality of the individual referred for assistance.

e. The hospital will sponsor periodic educational program regarding illness and impairment issues. Licensed independent Practitioners will be issued written information regarding illness issues at the time of initial appointment to the medical staff. Annual education will be provided at scheduled Medical Staff meetings.

## 10. PEER REVIEW *

a. All Medical Staff members shall participate in the facility protected peer review program established by the appropriate VHA policy and MCM 11-105, Peer Review Committee.

b. All Medical Staff members will complete ongoing required training associated with the associated VHA policy.

## 11. DISCLOSURE

a. All Medical Staff members shall follow VHA Directive 2008-002, Disclosure Policy and MCM 00QM-14, Disclosure of Adverse Events, to ensure they communicate adverse events openly and timely with their patient and/or the patient's representatives.

Adopted by the Medical Staff, VA Illiana Health Care System, Danville, IL this 23rd day of February 2023.

RECOMMEND

**GRANT GILROY**

Digitally signed by GRANT GILROY
Date: 2023.03.07 12:29:50 -05'00'

Grant Gilroy, DO
Acting Chief of Staff

Date

APPROVED

**Jon E Beidelschies 100521**

Digitally signed by Jon E Beidelschies 100521
Date: 2023.03.09 07:11:27 -06'00'

Jon Beidelschies, J.D.
Acting Director

Date

53